718 So.2d 138 (1998)
Gregory Alan KOKAL, Petitioner,
v.
Richard L. DUGGER, etc., Respondent.
Gregory Alan KOKAL, Appellant,
v.
STATE of Florida, Appellee.
Nos. 73102, 90622.
Supreme Court of Florida.
July 16, 1998.
Jefferson W. Morrow, Jacksonville, for Petitioner/Appellant.
*139 Robert A. Butterworth, Attorney General, and Curtis M. French, Assistant Attorney General, Tallahassee, for Respondent/Appellee.
PER CURIAM.
Gregory Alan Kokal appeals an order of the trial court denying relief under Florida Rule of Criminal Procedure 3.850 and petitions the Court for a writ of habeas corpus. We have jurisdiction. Art. V, § 3(b)(1, 9), Fla. Const. We affirm the denial of rule 3.850 relief and deny the writ.
The facts are set out fully in our opinion on direct appeal. See Kokal v. State, 492 So.2d 1317 (Fla.1986). Kokal and a friend, William O'Kelly, picked up a hitchhiker in September 1983 and drove him to a deserted area, where they beat, shot, and robbed him. Kokal later told an acquaintance that he planned to rob the hitchhiker and he deliberately shot him in the head because "dead men can't tell lies." Kokal was arrested and charged with first-degree murder. He testified at trial, blaming the shooting on O'Kelly, and was convicted as charged. During the penalty phase, his mother testified that he had been mistreated as a child. The jury unanimously recommended death and the court imposed a sentence of death based on four aggravating circumstances[1] and no mitigating circumstances. We affirmed.
In 1988, Kokal filed both a petition for a writ of habeas corpus in this Court and a rule 3.850 motion in the trial court. The trial court conducted an evidentiary hearing on the rule 3.850 motion in February 1997 to consider Kokal's claim that trial counsel had been ineffective. Kokal called as a witness Dr. Crown, a neuropsychologist who examined him in prison in 1996, and who testified that in his opinion Kokal sustained brain damage in a 1983 car wreck, and that on the night of the killing the combination of brain damage and alcohol consumption rendered him extremely disturbed and also impaired his capacity to appreciate the criminality of his conduct. This testimony was controverted by the State on cross-examination.[2] Kokal also called Dr. Virzi, a psychiatrist, who testified that he had examined Kokal pretrial in 1984 to evaluate his sanity and competence. Dr. Virzi now believes that Kokal's drug and alcohol abuse caused him to be emotionally disturbed and to have diminished capacity at the time of the crime. This testimony also was controverted by the State.[3] Finally, trial counsel Westling testified at length concerning the following: his own prior experience in trying criminal cases;[4] Kokal's *140 admission of the crime to him;[5] his Westling'spreparation of the case[6] and strategy at trial;[7] and Kokal's demeanor as a defendant.[8] The trial court denied the rule 3.850 motion, and Kokal now appeals that denial.[9] He also seeks relief under his pending habeas petition.[10]

RULE 3.850 MOTION
Kokal seeks reversal of the trial court's order denying rule 3.850 relief, arguing that trial counsel's performance was defective under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[11] We disagree. Our review of the record shows *141 that the trial court did not err in denying Kokal's claim of ineffectiveness in the guilt phase[12] or in the penalty phase.[13] The record *142 contains extensive evidence to support its ruling and we find no legal error. Kokal's remaining rule 3.850 claims are without merit[14] or procedurally barred.[15]

HABEAS CORPUS
Kokal argues that the trial court failed to excuse for cause three jurors who were death-biased, thus requiring him to expend peremptory challenges to strike the jurors. He claims appellate counsel was ineffective for failing to raise this issue. We disagree. The record shows that none of the three jurors actually served on the jury, and Kokal points to no objectionable juror who did serve. See Trotter v. State, 576 So.2d 691, 693 (Fla.1990) ("Where a defendant seeks reversal based on a claim that he was wrongfully forced to exhaust his peremptory challenges, he initially must identify a specific juror whom he otherwise would have struck peremptorily. This juror must be an individual who actually sat on the jury and whom the defendant either challenged for cause of attempted to challenge peremptorily or otherwise objected to after his peremptory challenges had been exhausted."). Appellate counsel cannot be faulted for failing to raise a nonmeritorious claim. Chandler v. State, 634 So.2d 1066 (Fla.1994).
Kokal next claims that the trial court improperly excused a life-biased juror for cause and that appellate counsel was ineffective for failing to raise this issue. Again, we disagree. Juror excusals for cause are normally within the trial court's discretion,[16] *143 and a court's ruling will be sustained unless no reasonable person would agree with the court.[17] The present record is replete with statements by venireperson Davis indicating that he was averse to imposing death: He said he did not think he could vote to recommend a death sentence; he would require the State to remove all doubt; he would require the State to prove its case beyond all doubt; he could not follow an instruction on reasonable doubt. On this record, we cannot say that no reasonable person would agree with the court's ruling. Appellate counsel cannot be faulted. Chandler.
Kokal argues that the trial court excused a black juror for cause and yet refused to excuse another juror who responded in virtually the same manner during voir dire. (Both jurors were challenged for cause by the State.) He claims that appellate counsel was ineffective for failing to raise this issue. We disagree. The record shows that Kokal did not preserve this issuehe did not object on a racial basis to the excusal of either juror. See Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982) ("[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection ... below."). Furthermore, while the record shows that venireperson Ashley is black, it does not show the race of venireperson Babcock. Appellate counsel cannot be faulted for failing to raise this claim. Chandler.
Kokal next claims that the prosecutor improperly argued lack of remorse in his closing argument in both the guilt and penalty phases, and he claims that appellate counsel was ineffective for failing to raise this issue. We disagree. The record shows that the penalty phase claim was not preserved Kokal did not object. Furthermore, the statement in the guilt phase was a one-word reference to remorse in a lengthy and otherwise proper closing argument. Kokal is not entitled to relief unless he can show first that "the alleged omission[][is] of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, [that] the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." Pope v. Wainwright, 496 So.2d 798, 800 (Fla. 1986).[18] We find no basis for reversal.
Kokal claims that jurors were misled concerning the importance of their role in recommending death, and that appellate counsel was ineffective for failing to raise this issue. We disagree. The underlying issue has already been decided adversely to the defendant. See, e.g., Johnson v. State, 660 So.2d 637, 647 (Fla.1995) ("[T]here is no merit to Johnson's argument that Florida's jury instructions denigrate the role of the jury...."). Appellate counsel cannot be faulted for failing to raise a nonmeritorious claim. Chandler. Furthermore, this claim was raised in the current rule 3.850 motion. See Blanco v. Wainwright, 507 So.2d 1377, 1384 (Fla.1987) ("By raising the issue in the petition for writ of habeas corpus, in addition to the rule 3.850 petition, collateral counsel has accomplished nothing except to unnecessarily burden this Court with redundant material.").
Kokal claims that no limiting construction was placed on the HAC aggravator. The record, however, shows that Kokal did not preserve this issuehe failed to object at trial. See Hardwick v. Dugger, 648 So.2d 100, 103 (Fla.1994) ("Claim 5, which challenges the sufficiency of the jury instructions on the CCP and HAC aggravating factors, is procedurally barred because trial counsel raised no objections to the wording of the instructions."). Furthermore, this issue was raised in the current rule 3.850 motion. See Blanco. Kokal's remaining habeas claims *144 are redundant[19] or were not preserved.[20]
Based on the foregoing, we affirm the denial of Kokal's rule 3.850 motion, and we deny his petition for writ of habeas corpus.
It is so ordered.
HARDING, C.J., and OVERTON, SHAW, KOGAN, WELLS, ANSTEAD and PARIENTE, JJ., concur.
NOTES
[1] The court found the following aggravating circumstances: (1) the murder was committed during the course of a robbery; (2) the murder was committed to avoid arrest; (3) the murder was especially heinous, atrocious, or cruel (HAC); (4) the murder was committed in a cold, calculated, and premeditated manner (CCP).
[2] Dr. Crown admitted on cross-examination that he did not prepare a written report on Kokal that CCR did not ask him toand thus no report was given to the State prior to the evidentiary hearing. He testified that Kokal's brain damage is not severe enough standing alone to have impaired him at the time of the crime and that the only evidence of alcohol consumption came from Kokal himself. Dr. Crown acknowledged that Kokal had successfully completed both his G.E.D. and a number of college courses. Dr. Crown did not know that Kokal had in fact feigned illness in order to obtain favored treatment in jail. Dr. Crown attributed no significance to the fact that hospital records following the 1983 auto accident: ruled out significant head injury, indicated that Kokal's condition was due to alcohol consumption, not head injury, and reported that Kokal was doing well when discharged. Nor did Dr. Crown attach significance to the fact that prison evaluations showed that Kokal was not suffering from any mental disorders and did not need counseling.
[3] Dr. Virzi acknowledged on cross-examination that he had examined Kokal in 1984 at the request of Dale Westling, defense counsel, and that he had evaluated Kokal for possible mitigation as well as for sanity and competence. Dr. Virzi knew of Kokal's history of drug and alcohol abuse at the time. He still agrees with everything he found in his original report and he concedes that when he examined Kokal in 1984 he found no evidence of organic brain disorder that Kokal was functioning normally.
[4] He had tried seventy-six criminal cases as a prosecutor prior to 1984, several of which were death cases. As a private lawyer, his practice in 1984 was 85 to 90 percent criminal. He had tried four or five death cases as a private lawyer, none of which had proceeded to the penalty phase. He had been retained, not appointed, to represent Kokal.
[5] In discussing the case with Westling, Kokal admitted shooting the victim and recounted in great detail the steps of the crime ("Greg knew every step that occurred that evening with great specificity."). When asked why he did it, Kokal told Westling, "Dead men tell no lies. That's why I did it," and then added, "and you know what, the mother fucker only had a dollar." Westling said that the account was "chilling."
[6] At the outset of his representation of Kokal, Westling collected all the police reports and read them. He investigated Kokal's medical, criminal, and social background, visited Kokal numerous times, and talked to him by telephone almost every day. Westling took many depositions and discussed this evidence with Kokal. Westling began thinking about penalty phase strategy the moment he was retained. He asked Kokal at the outset if he had any physical or mental disabilities or handicaps and Kokal told him no. He talked to both Kokal's mother and father. The father was not helpful. Neither Kokal nor his mother told Westling about a near-drowning in 1977 or the car accident in 1983. In spite of Kokal's admission of the crime, Westling hired Dr. Virzi on the off-chance of obtaining help. After receiving Dr. Virzi's report, which said Kokal knew exactly what he was doing, Westling phoned Virzi and asked if he had anything at all that could help in the defense and Virzi "got a little snotty" and said no. If Westling had called Virzi as a witness, Westling believed the report would have been discoverable and would have provided grounds for "three or four aggravating circumstances in and of itself." In Westling's opinion, Dr. Virzi "would have been a devastating witness" against the defense.
[7] Westling's strategy during the guilt phase was to contend that O'Kelly had been the triggerman. Kokal not only agreed with this approach, he insisted on testifying that he was not the killer. In light of Kokal's prior admission to Westling that he had in fact been the triggerman, Westling required Kokal to sign the following statement:

I, Gregory Kokal, acknowledge the fact that my attorney has advised me against testifying untruthfully in my trial. He has specifically told me that perjury is a felony and that it is a crime. Nevertheless, I have instructed him to call me as a witness and to "ask what happened." He has asked me to sign this statement as evidence that I acknowledge his advice.
[8] Kokal was "very astute" and was "incredibly bright, responsive, always appropriate in his remarks and responsive in responses, interested in the case."
[9] Kokal raises four issues, claiming error on the following points: (1) ineffectiveness of trial counsel during the penalty phase; (2) ineffectiveness of trial counsel during the guilt phase; (3) ineffectiveness of trial counsel in leading the jury to believe that the responsibility for deciding death lay elsewhere; (4) the trial court failed to adequately weigh the aggravating and mitigating circumstances.
[10] Kokal raises eight issues, claiming error on the following points: (1) the trial court refused to excuse for cause two jurors who were biased in favor of death; (2) the trial court excused for a cause a juror who was opposed to death but who could follow the law; (3) the trial court dismissed a juror based on race; (4) the prosecutor improperly argued remorse; (5) Caldwell violation (diminishing the role of the jury); (6) faulty HAC instruction; (7) the trial court instructed the jury that a life recommendation must be by a majority vote; (8) the trial court allowed the State to present victim impact evidence.
[11] The United States Supreme Court in Strickland set forth the following standard for ineffectiveness:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Id. 466 U.S. at 687, 104 S.Ct. at 2052 The federal Court further expounded on the second prong, i.e., the prejudice prong, of this standard:
The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
Id. 466 U.S. at 694, 104 S.Ct. 2052.
[12] The trial court order denying rule 3.850 relief provides in part:

The Defendant now attacks the competency of his trial counsel for failure to raise a defense of voluntary intoxication. Factually, however, that defense would have been very difficult to maintain. The Defendant had a clear memory of the events surrounding the killing, and his own psychiatric expert would not corroborate such a defense.... Moreover, the intoxication defense would have been inconsistent with, and might have precluded, the Defendant's strategy of blaming someone else for the shooting. Also the Defendant has failed to show how he has been prejudiced by his counsel's strategic decision to not pursue the voluntary intoxication defense. In short, there is no substance to the Defendant's claim with regard to this matter. A tactical decision not to use a voluntary intoxication defense is not generally subject to collateral attack.
Defendant also claims that Mr. Westling's representation was inadequate because of his failure to object to the admissibility at trial of the gun used to kill the victim. Again, though, this decision was a matter of strategy....
Here, the Defendant's lawyer had every reason to believe that any objection to the admissibility of the gun would be overruled, because a pretrial motion to suppress the same had been denied. He decided, then, not to object to the admissibility because he did not want to appear obstreperous to the jury; and because the Defendant claimed he never used the gun anyway. Moreover, the Supreme Court pointed out in affirming this conviction that even if the Defendant had properly preserved the issue of the admissibility of the gun by objecting at trial, there would have been no merit to the objection. In the end, it is clear that the trial counsel's decision not to object to the admissibility of the gun was not "so patently unreasonable that no competent attorney would have chosen it."
The defendant also criticizes the competence of his trial counsel by virtue of the way the lawyer chose to cross-examine the witness who heard the Defendant's inculpatory statement; and by virtue of his calling the co-Defendant as a witness. However, both of these choices were clearly a matter of sound strategy. First, Mr. Westling thought it best to portray the witness who heard the statement as being confused over what he heard, in light of his apparent intoxication at the time. Contrary to Defendant's assertion, this tact did not call for an outright attack on the witness' veracity. Next, the co-Defendant was called as a witness for the purpose of placing in evidence the letter he had written in which he had incriminated himself as to the shooting. Neither of these matters of strategy could by any stretch of the imagination have fallen outside the range of what is expected of reasonably competent counsel. These decisions will not now be second-guessed.
....
Clearly, the Defendant has completely failed to demonstrate that he is entitled to any relief from the judgment therein as a result of his attorney's performance during the guilt phase of the trial.
(Citations omitted.)
[13] The trial court order denying rule 3.850 relief further provides:

This Court is by no means convinced that the Defendant has demonstrated a reasonable probability that a different sentence would have been imposed if the foregoing mitigation [by Dr. Crown] had been presented. It is not necessary, at any rate, to reach a conclusion as to that issue. A trial counsel cannot be held to be ineffective for failing to seek a proper mental health examination (in this case, that of a neuro-psychologist), when he has no reason to suspect that appropriate mental health mitigation could have been developed. "Merely proving that someoneyears laterlocated an expert who will testify favorably is irrelevant unless the petitioner, the eventual expert, counsel, or some other person can establish a reasonable likelihood that a similar expert could have been found at the pertinent time by an ordinarily competent attorney using reasonably diligent effort."
Here, the trial counsel made inquiry of the Defendant and both his parents about the Defendant's background. The Defendant's father would not cooperate with the Defendant's lawyer at all. The mother was asked specifically if the Defendant had any mental or physical disabilities, and none was revealed. Significantly, none of these individuals ever told the defense trial counsel about the near drowning incident or the car wreck. The Defendant asserts that his lawyer should, nonetheless, have made efforts to find all of his past medical records. Even if he had, though, there is no indication that any medical treatment was given as a result of the near drowning incident. As to the automobile accident, the hospital records which exist indicate the doctors found no indication of brain damage. In short, the Defendant has failed to demonstrate how his trial counsel could have hoped to have developed mitigating evidence associated with actual brain damage.
Nonetheless, the Defendant criticizes the way his lawyer used an examining psychiatrist in preparation for the penalty phase defense. The psychiatrist only examined the Defendant once, and never had an opportunity to perform psychological tests on the Defendant, despite the doctor's request for the same. Indeed, it appears to this Court that the defense lawyer's over-all preparation for the penalty phase of the trial may have fallen below that expected of reasonably competent counsel. The lawyer did little more than simply think about the penalty phase until after the guilt phase was completed.
Questions regarding any deficiency in Mr. Westling's preparation are irrelevant, though, if the Defendant cannot prove the existence of the second prong of the Strickland v. Washington test for ineffectiveness of counsel. To do so, he must show that he was prejudiced by any failure to prepare. He cannot meet this burden with regard to his psychiatrist's testimony if he cannot show that additional preparation would have changed the psychiatrist's opinion at trial.
Here, the psychiatrist testified at the hearing on this motion that, despite all he had learned about the Defendant since the trial (including the information about the brain damage provided by the neuro-psychologist), his opinion regarding the Defendant had not changed. That opinion is that, based on his history of alcohol and drug abuse, the Defendant had some generally diminished mental capacity. However, the Defendant's apparent ability to vividly recall the events of the murder, combined with his ability to function in terms of walking, talking, and driving a car, militated against any concept of specific diminished mental capacity with regard to his crime. In short, nothing the psychiatrist knew at the time of the trial or has learned since would indicate any death penalty mitigation, except generally as to the fact that the Defendant had a long history of alcohol and drug abuse.
This history of alcohol and drug abuse was brought forth during the penalty phase of the trial, although not through the psychiatrist. The doctor was not called to testify for strategic reasons. Had the psychiatrist been called as a defense mitigation witness to testify about any diminished mental capacity or possible emotional distress at the time of the crime, trial counsel knew that he could be effectively cross-examined. The psychiatrist's own report indicated his belief that the Defendant understood the consequences of his actions. The strategic decision not to use a mental health expert cannot ordinarily form the basis for collateral relief. In the end, the Defendant has failed to establish with regard to trial counsel's use of the psychiatrist "that the approach taken by defense counsel would not have been used by professionally competent counsel." The Defendant has, further, failed to show how he was prejudiced by any alleged failure of trial counsel to have made better use of his psychiatrist. As the Supreme Court noted in affirming this conviction on direct appeal, the Defendant's detailed memory about the crime "contradicts the notion that he did not know what he was doing."
Likewise, the Defendant has failed to adduce any other evidence as to how he may have been prejudiced by any supposed deficiency in preparation for the penalty phase.
(Citations omitted.)
[14] Kokal claims in Issue 3 that the trial court denigrated the jury's role as sentencer. This issue, however, has already been decided adversely to the defendant. See, e.g., Johnson v. State, 660 So.2d 637, 647 (Fla.1995) ("[T]here is no merit to Johnson's argument that Florida's jury instructions denigrate the role of the jury....").
[15] Kokal claims in Issue 4 that the trial court improperly weighed the aggravators and mitigators. This issue, however, is procedurally barredit was addressed on direct appeal. See Medina v. State, 573 So.2d 293, 295 (Fla.1990) ("Proceedings under rule 3.850 are not to be used as a second appeal.").
[16] See Gore v. State, 706 So.2d 1328 (Fla.1997).
[17] Huff v. State, 569 So.2d 1247 (Fla.1990).
[18] See also Hardwick v. Dugger, 648 So.2d 100, 106 (Fla.1994) ("Although appellate counsel could have argued this point on direct appeal, he cannot be deemed ineffective for failing to do so. As this Court has noted, appellate counsel need not raise every conceivable claim.").
[19] Kokal claims in Issue 7 that the penalty phase jury was erroneously instructed that a vote of a majority of jurors is required for a life recommendation, and that appellate counsel was ineffective for failing to raise this. This issue, however, was raised in the current rule 3.850 motion. See Blanco. (We note that the jury recommendation in the present case was unanimous.)
[20] Kokal claims in Issue 8 that the State presented improper victim impact evidence. The record, however, shows that this claim was not preservedKokal did not object at trial. See Grossman v. State, 525 So.2d 833, 842 (Fla.1988) ("There is nothing in the Booth opinion which suggests that it should be retroactively applied to the cases in which victim impact evidence has been received without objection.").