901 So.2d 766 (2005)
Gregory Alan KOKAL, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-882.
Supreme Court of Florida.
January 13, 2005.
As Revised on Denial of Rehearing April 28, 2005.
*767 Michael P. Reiter, Capital Collateral Regional Counsel and Linda McDermott, Assistant CCRC, Northern Region, Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General and Curtis M. French, Senior Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Gregory Alan Kokal, a prisoner under sentence of death, appeals an order of the circuit court denying a successive motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. Additionally, Kokal appeals an order of the circuit court denying his motion to disqualify the trial judge, and further presents a claim of a violation of his due process rights caused by the State's alleged loss of evidence. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed herein, we affirm both of the trial court's orders, and hold that Kokal's due process claim is procedurally barred.

FACTS
In 1984, Gregory Kokal was convicted of the first-degree murder of Jeffrey Russell and sentenced to death. This Court upheld his conviction and sentence on direct appeal. See Kokal v. State, 492 So.2d 1317, 1320 (Fla.1986) (hereinafter "Kokal I"). We detailed the facts of the crime and Kokal's subsequent arrest in our opinion on direct appeal:
Kokal and a companion picked up a hitchhiker about midnight on the 29th or *768 30th of September 1983 and drove to a beach park near Jacksonville. When they alighted from the truck, the hitchhiker was struck with a pool cue belonging to Kokal and robbed. The victim was then marched about 100 feet at gunpoint where he was beaten unconscious with the pool cue as he pleaded for his life and then was killed with a single shot from a .357 revolver. When the body was discovered the following morning, the police initially believed, and the news media reported, that the victim had been beaten to death. An autopsy revealed that the gunshot was the cause of death, but this information was restricted to the doctor performing the autopsy and to investigating personnel.
The following morning Kokal was apprehended by a police officer after fleeing in his companion's truck from a gas station without paying for gas. When confronted by the police officer and gas station attendant, Kokal offered to pay for the stolen gas, but did not have sufficient cash. When asked for identification, Kokal produced his own Florida driver's license, a Colorado driver's license belonging to his companion, a New York driver's license belonging to the victim, and an Arizona vehicle registration for the truck which was titled to his companion. The officer determined that the truck had not been stolen in Florida but was unable to check through the National Crime Information Computer because of system outage. He arrested Kokal and seized and inventoried the truck. Within the truck the officer found the murder weapon and a box of shells, both of which had Kokal's fingerprints. At the time of Kokal's arrest, the police did not know of his involvement in the murder and released him that day. Later that evening, Kokal told a friend of specific details of the robbery and murder not known to the public, including the fact that the victim was killed by a gunshot following the robbery because "dead men can't tell lies."
Id. at 1318-19.
At trial, Kokal testified on his own behalf. His testimony was consistent with the facts as detailed above; however, he stated that it was his companion, William O'Kelly, who actually beat, robbed, and shot the victim. While Kokal admitted to being present during the murder, he denied any involvement. It was not disputed at trial that the weapon used to shoot Russell belonged to O'Kelly. Further, a crucial piece of evidence in the State's case was a pair of Nike sneakers that Kokal admitted were his and that he had been wearing on the night of the murder. Blood matching the victim's blood type was found on the sneakers. During his testimony Kokal explained that at one point during the murder he was standing approximately six to nine feet away from O'Kelly when O'Kelly beat the victim with a pool cue and blood from the victim spattered onto his sneaker.
During the trial, the defense also called O'Kelly as a witness. On direct examination, O'Kelly admitted to being with Kokal on the night of the murder, but denied ever firing the weapon. He was then questioned regarding a letter he had written to Kokal in November 1983, in which he wrote that it was he, O'Kelly, who had fired the weapon that night and had accidentally shot the victim in the head. On cross-examination by the State, O'Kelly testified that at the time he wrote the letter, he was attempting to establish an explanation that would exonerate both him and Kokal of the crime. He stated that Kokal was his friend and he wanted to help him. O'Kelly then proceeded to detail the events that occurred on the night of the murder. O'Kelly recounted almost the identical story as Kokal, except he *769 claimed that Kokal was the sole perpetrator and that he played no role whatsoever in the crime. He noted that he was arrested shortly after the murder and on the night he was arrested he told the police the same story he had just testified to, i.e., that despite what he had written in the letter, the truth was that Kokal had committed the crime.
During its case in chief, the State presented the testimony of Eugene Mosley, a friend of Kokal's who spoke with Kokal the night after the murder. Mosley explained that he met with Kokal in Kokal's garage, where Kokal was packing his truck to leave. Kokal told Mosley that he and O'Kelly were going to Canada because Kokal had killed a man. Mosley testified that Kokal then relayed to him what had transpired during the crime. According to Mosley, Kokal told him that both he and O'Kelly had beaten Russell with the pool cue, and that both had beaten and kicked Russell after he was lying on the beach. However, Mosley testified that Kokal informed him that it was he, Kokal, who had actually shot Russell in the head. According to Kokal, the motive was to rob the victim. Mosley testified that when he asked Kokal why he had shot the victim, Kokal said "because dead men can't tell lies."
Kokal was convicted of first-degree murder. By a vote of twelve to zero the jury recommended a sentence of death, which the judge imposed. The jury's verdict on the first-degree murder charge included the specific finding that it was Kokal who had shot Russell. See Kokal I, 492 So.2d at 1319. O'Kelly pled guilty to second-degree murder, agreed to testify truthfully if called, and received a fourteen-year sentence. We affirmed Kokal's conviction and death sentence on direct appeal. See id. at 1320.
This Court denied rehearing in Kokal's direct appeal on September 17, 1986. Subsequently, on August 25, 1988, then-Governor Martinez signed Kokal's death warrant. An initial postconviction motion was filed shortly thereafter, and the trial court entered an order on October 12, 1988, staying the execution indefinitely and scheduling an evidentiary hearing on the motion. See State v. Kokal, 562 So.2d 324, 325 (Fla.1990) (hereinafter "Kokal II"). Following litigation regarding a public records issue, see id., an amended postconviction motion was filed on May 18, 1992. In February 1997, an evidentiary hearing was held on Kokal's amended postconviction motion. The trial court denied the motion, and Kokal appealed to this Court, presenting four issues. See Kokal v. Dugger, 718 So.2d 138, 139 (Fla.1998) (hereinafter "Kokal III"). With little discussion, we affirmed the denial of Kokal's postconviction motion. See id. at 140-42.[1]
On August 16, 1999, Kokal filed a pro se successive postconviction motion claiming actual innocence based upon newly discovered evidence. The newly discovered evidence relied upon by Kokal was an affidavit, written and signed by Gary Hutto on August 10, 1999, in which Hutto claimed that Kokal's codefendant, William O'Kelly, was the actual perpetrator of the murder for which Kokal was convicted. Hutto explained that he had shared a jail cell with O'Kelly for approximately two months in 1984, and that during that time O'Kelly detailed the murder, admitted that he was the one who had actually shot Russell, and stated that Kokal had not participated in the commission of the crime.
Importantly, Hutto's affidavit implicating O'Kelly in the Russell homicide was provided subsequent to an affidavit O'Kelly *770 wrote, in which he implicated Hutto in a separate murder. See Kight v. State, 784 So.2d 396 (Fla.2001). Charles Kight had been convicted of first-degree murder and sentenced to death. See Kight, 784 So.2d at 398. However, like Kokal, Kight maintained that while he was present during the murder, it was actually his codefendant, Gary Hutto, who had committed the crime. See id. As Hutto would later do in the instant action, Kokal's codefendant, O'Kelly, testified on behalf of Kight that Hutto had confessed to him that it was he, Hutto, who had committed the murder for which Kight had been convicted. See id. at 399. In a successive postconviction action, Kight presented a newly discovered evidence claim based on an affidavit by O'Kelly asserting that Hutto was the actual perpetrator. See id. The trial court denied Kight relief, finding that while O'Kelly's testimony implicated Hutto, it did not absolve Kight. See id.
The Office of the Capital Collateral Regional Counsel (CCRC) was appointed to represent Kokal in his successive postconviction action. The State filed its answer to Kokal's pro se postconviction motion on October 18, 1999. After a series of delays, a Huff[2] hearing was scheduled for April 6, 2000. On April 3, 2000, Kokal filed an amended postconviction motion presenting four claims.[3] On April 6, 2000, the day of the Huff hearing, the defense further filed a motion to disqualify the judge, and on that same day, filed a motion to inspect, examine, and test evidence, specifically the white Nike sneakers that Kokal was wearing the night of the murder, to determine, through DNA testing, whether the blood on those sneakers was that of the victim.
The only issues addressed at the Huff hearing on April 6 were Kokal's motion to disqualify the judge and whether an evidentiary hearing should be held on Kokal's claim of newly discovered evidence. Following a discussion on both issues, the judge requested additional briefing from the parties and postponed ruling on any issue until he could determine the propriety of Kokal's disqualification motion. Subsequently, both parties filed a memorandum regarding the disqualification issue. On June 30, 2000, Judge Carithers entered an order denying Kokal's motion to disqualify him.
With the disqualification issue settled, a second Huff hearing was held on September 12, 2000, to determine whether an evidentiary hearing should be held on the remaining claims presented in Kokal's amended postconviction motion. Additionally, at that hearing, Kokal's attorney again referenced the DNA issue, and requested the court's permission to have an independent investigator inspect the Nike sneakers Kokal was wearing the night of the murder to ascertain whether they could be tested. The court granted the defense access to the sneakers. Following the Huff hearing, the judge ordered that an evidentiary hearing be held with respect to Kokal's newly discovered evidence claim and denied an evidentiary hearing on Kokal's remaining claims.
The evidentiary hearing was held on October 31, 2000. At the start of the hearing, the DNA issue was again discussed. Kokal's attorney stated that he had confirmed that morning that the sneakers were available for testing.[4] Two *771 witnesses testified during the evidentiary hearing, Gary Hutto and a private investigator, Jeff Walsh. Walsh had worked for the attorney who represented Kokal in his federal habeas proceedings, and at her direction had contacted Gary Hutto. Walsh testified that he contacted Hutto and asked if he had any information regarding the Kokal case. Hutto provided Walsh with the information that was eventually written in the affidavit.
Hutto testified at the evidentiary hearing regarding what O'Kelly had allegedly told him about the events of the Russell homicide. Hutto maintained that he was told by an assistant state attorney that O'Kelly had implicated him in the Kight murder only after he had spoken to Walsh and written his affidavit implicating O'Kelly. Hutto stated that he did not care that O'Kelly had implicated him because he, Hutto, was already serving time for the wrong that he had committed. Hutto further claimed that when Walsh first approached him, he did not know on whose behalf Walsh was speaking to him, since Walsh simply asked him if he knew anything about the "Kokal/O'Kelly case." However, Hutto admitted that by the time he wrote and signed the affidavit, he knew that Walsh was speaking with him on behalf of Kokal.
Prior to ruling on Kokal's successive postconviction action, the judge held another hearing on December 15, 2000, to address the DNA issue. At that hearing, Kokal's attorney explained that she was having difficulty locating an expert who could examine the sneakers to determine if they were suitable for DNA testing. The attorney for the State noted that there was potentially no remaining sample of the victim's DNA to which a comparison could be made, even if the blood on the sneakers could be tested. Kokal's attorney then stated that she did not know if any substance suitable for comparison existed. Assistant State Attorney Laura Starrett then stated, "If we don't have the victim's blood, which we definitely do not have, I'm not really sure where we are going with, or what you're looking for." In response, the judge asked, "Ms. Starrett, you're telling me that there are no remaining blood samples of the victim?" to which Assistant State Attorney Starrett responded, "That's correct." Despite that representation, the judge determined that the next step was for Kokal's attorney to send him a report regarding the results of the independent expert's analysis of the sneakers.
On January 25, 2001, Kokal's attorney sent the judge a letter that read: "After reviewing the [Florida Department of Law Enforcement] reports and based upon the State's representation that the victim's blood sample has been destroyed it appears that at this time there is no sample with which to compare any potential results." No further action was taken with respect to the DNA issue, and subsequently, the judge entered his final order denying Kokal's successive postconviction motion. Kokal filed a motion for rehearing, which was denied. Kokal appealed the judge's denial of his postconviction motion to this Court, and oral argument was scheduled for November 4, 2002.
In early October 2002, Kokal filed with the trial court a motion for DNA testing and in this Court a motion to hold oral argument in abeyance. We granted the motion to hold oral argument in abeyance and temporarily relinquished jurisdiction to the trial court to resolve the DNA issue. *772 The trial court held a hearing on November 13, 2002, to address the DNA issue. Although the judge expressed that he was surprised Kokal had filed the motion for DNA testing, as it was his understanding that the DNA issue had been settled, he ordered the release and DNA testing of the relevant evidence.
In April 2003, Kokal's attorney filed a motion for an evidentiary hearing to determine where the evidence collected in the homicide investigation was located. In the motion, counsel asserted that in March 2003 she spoke with an analyst from the Florida Department of Law Enforcement (hereinafter "FDLE") who informed her that the victim's blood sample was no longer suitable for testing, but that she believed there was a saliva sample of the victim maintained by the Jacksonville Sheriff's Office that could be used for comparison testing. Counsel was later informed by a representative of the Jacksonville Sheriff's Office that it did not have a saliva sample. Kokal's counsel sought the evidentiary hearing to determine the location of the saliva sample.[5] The judge granted the motion, and an evidentiary hearing was set for June 2003. Following the hearing, the trial court entered an order denying Kokal's motion for DNA testing.[6]

ANALYSIS
Kokal presents five claims in this Court. First, he appeals the trial court's denial of his motion to disqualify the trial judge. Next, he appeals the denial of three claims from his successive postconviction motionthe newly discovered evidence claim, the ineffective assistance of postconviction counsel claim, and his claim challenging the constitutionality of Florida's death penalty statute. Finally, Kokal presents this Court with a due process challenge, asserting that his constitutional rights were violated by the State's failure to preserve evidence.

DISQUALIFICATION OF TRIAL JUDGE
As noted above, the initial Huff hearing to address Kokal's postconviction motion was held on April 6, 2000. On that same day, Kokal filed his Motion to Disqualify Judge and Supporting Memorandum of Law. The court and the parties discussed the motion, despite the fact that the judge and State had just received the motion,[7] and the State had not had an opportunity to respond. In his motion, Kokal argued that Judge Carithers could not be impartial because he had also presided over, at the trial level, the postconviction action in Kight v. State, 784 So.2d 396 (Fla.2001), in which Kokal's codefendant, O'Kelly, had testified on behalf of Kight, implicating Gary Hutto in the murder for which Kight had been convicted. Kokal's motion to disqualify Judge Carithers in the instant action asserted that the judge could not be impartial because during his testimony in the Kight matter, O'Kelly had professed his innocence to the murder for which Kokal had been convicted, and testified that he had never committed murder. In *773 the instant action, Hutto's affidavit stated that O'Kelly was the actual perpetrator of the murder for which Kokal had been convicted. Kokal contended that it would constitute at least an appearance of impropriety for Judge Carithers to continue presiding over Kokal's postconviction action because Judge Carithers would be required to determine the credibility of both Gary Hutto and William O'Kelly, and the judge had already determined, in the Kight action, that O'Kelly was credible when he testified there that he had never committed murder.
At the April 6 Huff hearing in Kokal's action, Judge Carithers expressed that it was his "gut reaction" that Kokal's motion to disqualify turned on whether or not he would be called upon to judge the credibility of Hutto. However, he requested that the parties submit briefs regarding whether he should recuse himself even if an evidentiary hearing would not be held on the newly discovered evidence claim. Both parties submitted briefs as requested by the trial court. Notably, the State argued that the motion was both untimely and meritless. The State highlighted that Kokal's motion was a successive motion to disqualify, a fact apparently unknown to the judge during the initial hearing on the motion. Subsequently, the trial court denied Kokal's motion to disqualify. Initially, the judge ruled that the motion "may have been untimely" because the facts constituting the grounds for the motion were in the possession of Kokal's counsel months before the motion was filed.[8] The judge then ruled that regardless of the timeliness issue, because Kokal's motion was a successive disqualification motion, the court could rule on the merits of the motion. The court then wrote: "After careful consideration of the matters raised in Defendant's Motion to Disqualify, the Court has determined that it remains, and will continue to be, an impartial arbitrator as to Mr. Kokal's pending Rule 3.850 motion. Specifically, the Court finds that it is not true that it `cannot be impartial' because of the potential testimony of William Robert O'Kelly, Jr. herein."[9]
Substantively, the disqualification of a judge is controlled by section 38.10 of the Florida Statutes, while procedurally it is controlled by rule 2.160 of the Florida Rules of Judicial Administration. Also relevant is Canon 3E of the Florida Code of Judicial Conduct. Both section 38.10 and rule 2.160 provide that a different standard should be utilized for a successive disqualification motion than is used for an initial motion. Section 38.10 provides, in relevant part:
[W]hen any party to any action has suggested the disqualification of a trial judge and an order has been made admitting the disqualification of such judge and another judge has been assigned and transferred to act in lieu of the judge so held to be disqualified, the judge so assigned and transferred is not disqualified on account of alleged prejudice against the party making the suggestion in the first instance, or in favor of the adverse party, unless such judge admits and holds that it is then a fact that he or she does not stand fair and impartial between the parties.
§ 38.10, Fla. Stat. (2003). Similarly, rule 2.160 provides:
(g) DeterminationSuccessive Motions. If a judge has been previously *774 disqualified on motion for alleged prejudice or partiality under subdivision (d)(1), a successor judge shall not be disqualified based on a successive motion by the same party unless the successor judge rules that he or she is in fact not fair or impartial in the case. Such a successor judge may pass on the truth of the facts alleged in support of the motion.
Fla. R. Jud. Admin. 2.160(g). Finally, Canon 3E of Florida's Code of Judicial Conduct provides, in relevant part:
(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding; ...
Fla.Code Jud. Conduct, Canon 3E.
During the course of his first postconviction action, Kokal filed two motions to dismiss the presiding judge, one of which was successful. First, in May 1992, Kokal moved to disqualify the initial judge, Circuit Judge David C. Wiggins, from presiding over Kokal's postconviction action, and Judge Wiggins granted that motion. Then, in October 1993, Kokal moved to disqualify the second judge, Circuit Judge Robert M. Foster. Although Judge Foster denied the motion, he was subsequently replaced by Circuit Judge Aaron K. Bowden. Finally, in March 1994, Judge Bowden, sua sponte, recused himself and was replaced by Judge Carithers, who ultimately presided over Kokal's first postconviction action, and the instant successive postconviction action. Kokal does not dispute that Judge Carithers is a successive judge. Therefore, the trial court, in its order denying Kokal's motion for disqualification, properly used the more stringent standard for a successive disqualification motion, and this Court's standard of review of that denial is "whether the record clearly refutes the successor judge's decision to deny the motion." Pinfield v. State, 710 So.2d 201, 202 (Fla. 5th DCA 1998); see also King v. State, 840 So.2d 1047, 1049 (Fla.2003) ("An order denying a motion pursuant to rule 2.160(g) is reviewed for abuse of discretion."); Quince v. State, 732 So.2d 1059, 1062 (Fla.1999) ("A court's ruling on a discretionary matter will be sustained unless no reasonable person would take the view adopted by the court.").
Initially, the State maintains that Kokal's motion was untimely. Rule 2.160 provides: "A motion to disqualify shall be filed within a reasonable time not to exceed 10 days after discovery of the facts constituting the grounds for the motion...." Fla. R. Jud. Admin. 2.160(e). The trial court found that Kokal's motion "may have been untimely" because Kokal knew that Judge Carithers had presided over the Kight postconviction action for at least five months. Irrespective of the timeliness of Kokal's motion, because it is clear from the face of the motion that the disqualification of Judge Carithers was not warranted, we affirm the judge's order denying Kokal's motion.
Kokal contends that Judge Carithers should have been disqualified because he presided over the Kight postconviction action and, more specifically, because of the testimony presented by Kokal's codefendant, O'Kelly, during that proceeding. In his motion, Kokal asserted that Judge Carithers could not be impartial because in Kight he had to consider the credibility of both O'Kelly and Hutto, and there he determined O'Kelly to be credible and Hutto not. In the instant action, Judge Carithers was once again faced with considering the credibility of O'Kelly and Hutto. On *775 the asserted grounds, the trial judge did not abuse his discretion by denying Kokal's motion and finding that he could be impartial. This Court has held that
[t]he fact that a judge has previously made adverse rulings is not an adequate ground for recusal. Nor is the mere fact that a judge has previously heard the evidence a legally sufficient basis for recusal. Likewise, allegations that the trial judge had formed a fixed opinion of the defendant's guilt, even where it is alleged that the judge discussed his opinion with others, is generally legally insufficient to mandate disqualification.
Jackson v. State, 599 So.2d 103, 107 (Fla.1992) (citations omitted); see also Thompson v. State, 759 So.2d 650, 659 (Fla.2000). In Jackson, the defendant argued that the trial judge should be recused because he had heard the case no less than five times, including two trials of Jackson's codefendant. See Jackson, 599 So.2d at 107. Based upon the less stringent standard applied to initial motions for disqualification, the trial court denied the motion, finding it legally insufficient. See id. We agreed. See id. Likewise, here, Kokal's motion was properly denied because his asserted justification for the motion was legally insufficient. The fact that Judge Carithers had previously determined that O'Kelly was being truthful in the Kight action is not a legally sufficient ground for disqualification. Kokal's asserted grounds for disqualification do not satisfy the less stringent standard of legal sufficiency applied to an initial motion for disqualification. Therefore, as he does not satisfy the lower standard, he certainly does not satisfy the more stringent standard applied to a successive motion. The trial court did not err in denying Kokal's motion to disqualify Judge Carithers.

NEWLY DISCOVERED EVIDENCE
In his next claim, Kokal asserts that the trial court erred in denying his claim of newly discovered evidence of actual innocence. To obtain relief on this claim Kokal had to demonstrate: (1) that the newly discovered evidence was unknown to the defendant or the defendant's counsel at the time of trial and could not have been discovered through due diligence, and (2) that the evidence is of such a nature that it would probably produce an acquittal upon retrial. See Mills v. State, 786 So.2d 547, 549 (Fla.2001); Jones v. State, 709 So.2d 512, 521 (Fla.1998). With respect to the first prong, the trial court properly found that the evidence Kokal presented was unknown at the time of Kokal's trial, and neither Kokal nor his counsel could have discovered it through due diligence. Kokal's trial was held in 1984, but Hutto did not sign his affidavit attesting that O'Kelly had confessed that it was he, and not Kokal, who had actually killed Russell until 1999. Therefore, the trial court's ruling with respect to the first prong was correct.
Turning to the second prong of the newly discovered evidence test, the lower court concluded that O'Kelly's alleged confession to Hutto probably would not produce an acquittal upon retrial. The court's ruling was not erroneous. In reviewing a claim of newly discovered evidence, a trial court is required to " `consider all newly discovered evidence which would be admissible' at trial and then evaluate the `weight of both the newly discovered evidence and the evidence which was introduced at the trial.'" Jones, 709 So.2d at 521 (quoting Jones v. State, 591 So.2d 911, 916 (Fla.1991)) (emphasis supplied). Initially, we note that Hutto's testimony would not have been admissible at trial, because it constituted inadmissible hearsay. See Jones v. State, 678 So.2d 309, 313 (Fla.1996). Further, O'Kelly's alleged confession is not admissible pursuant to the statement against interest exception to the hearsay rule, since Kokal has failed to *776 demonstrate that O'Kelly is unavailable to testify. See id.
Even if Hutto's testimony was admissible for the limited purpose of impeaching O'Kelly's credibility, the testimony is not of such a nature that it would probably produce an acquittal upon retrial. As the trial court correctly recognized, Hutto is "highly impeachable," because he has a clear motive of revenge. William O'Kelly previously testified on behalf of Charles Kight and implicated Hutto in the homicide for which Kight was convicted and sentenced to death. The trial court wrote:
Since Mr. O'Kelly's alleged remarks to Mr. Hutto would have been made before Mr. Hutto's sentencing in his criminal case, it is hard to understand why he would come forward with the evidence now, rather than when it could have helped him in his own sentencing. The implication is clear, notwithstanding Mr. Hutto's testimony to the contrary, that he only came forward with evidence against Mr. O'Kelly in this case because Mr. O'Kelly had come forward with evidence against Mr. Hutto in the case of Charles Kight.
We agree with this conclusion. Hutto's motives in providing an affidavit implicating O'Kelly in the Russell murder are highly suspect in light of O'Kelly's testimony in Kight.
More significant than the fact that Hutto could be easily impeached is the fact that Hutto's testimony contradicts other evidence presented at trial, most notably the testimony of Kokal himself. In his version of events, Hutto claims that O'Kelly told him that Kokal remained in the truck throughout the beating and murder. However, Kokal himself testified at trial that he did not stay in the truck throughout the attack; rather, that after the initial beating occurred he walked down the beach with the victim and O'Kelly before O'Kelly shot Russell. Further, Kokal explained that the victim's blood spattered on his sneaker when he was standing six to nine feet away from the victim as O'Kelly beat him. Hutto's testimony also contradicts that of Eugene Mosley, who testified that Kokal confessed to him. In contrast to Hutto's testimony, Mosley testified that Kokal told him that both he and O'Kelly beat the victim, but that it was he, Kokal, who actually shot Russell. Mosley's testimony is unquestionably more reliable, because it was given shortly after the murder occurred and because Mosley, a friend of Kokal's who was in no way involved in the crime, had no ulterior motive behind his testimony, unlike Hutto.
Finally, in conducting a cumulative analysis of newly discovered evidence, we must evaluate the newly discovered evidence in conjunction with the evidence submitted at trial and the evidence presented at prior evidentiary hearings. See Jones, 709 So.2d at 522. Here, the trial court determined that "acquittal on retrial in light of all the other trial evidence, and all of the new evidence, is virtually inconceivable." At trial, evidence was presented that Kokal had bloodstains consistent with the victim's blood type on his shoes the morning after the murder. Further, Kokal's fingerprints were on the murder weapon, Kokal had the victim's driver's license after the murder, and Kokal confessed to Mosley that he had killed the victim. Kokal has failed to meet the second prong of the newly discovered evidence test because he cannot demonstrate that Hutto's testimony would probably produce an acquittal or a life sentence upon retrial. The overwhelming evidence of Kokal's guilt supports the trial court's denial of relief. Accordingly, the trial court correctly determined that Kokal is not entitled to a new trial or penalty phase *777 on the basis of his claim of newly discovered evidence.

INEFFECTIVE ASSISTANCE OF POSTCONVICTION COUNSEL
The trial court did not err in refusing to grant Kokal an evidentiary hearing on his claim of ineffective assistance of postconviction counsel. As we have repeatedly held: "Under rule 3.850, a postconviction defendant is entitled to an evidentiary hearing unless the motion and record conclusively show that the defendant is entitled to no relief." Lawrence v. State, 831 So.2d 121, 132 (2002) (quoting Floyd v. State, 808 So.2d 175, 182 (Fla.2002)). Based upon our precedent regarding claims of ineffective assistance of postconviction counsel, and the record of Kokal's first postconviction action which conclusively demonstrates that Kokal was provided meaningful access to the judicial process, it is unquestionable that Kokal was not entitled to relief on this claim and, therefore, it was not error for the trial court to deny him an evidentiary hearing.
We have repeatedly held that claims of ineffective assistance of postconviction counsel are not cognizable. See Foster v. State, 810 So.2d 910, 917 (Fla.2002); King v. State, 808 So.2d 1237, 1245 (Fla.2002); Waterhouse v. State, 792 So.2d 1176, 1193 (Fla.2001); Lambrix v. State, 698 So.2d 247, 248 (Fla.1996). As recognized by both this Court and the United States Supreme Court, "defendants have no constitutional right to representation in postconviction relief proceedings." State ex rel. Butterworth v. Kenny, 714 So.2d 404, 407 (Fla.1998); see also Pennsylvania v. Finley, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). As we explained in Butterworth: "All that is required in postconviction relief proceedings, whether capital or non-capital, is that the defendant have meaningful access to the judicial process." Butterworth, 714 So.2d at 408. Notably, by statute, claims of ineffective assistance of postconviction counsel are barred in federal court. See 28 U.S.C. § 2254(i) (2000) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). Because Kokal does not possess a constitutional right to postconviction counsel, and further, because we have refused to recognize claims of ineffective assistance of postconviction counsel, Kokal's claim regarding the ineffectiveness of counsel's representation of Kokal during his first postconviction litigation was properly summarily denied.
In his brief to this Court, Kokal relies upon our order in Fotopoulos v. State, 741 So.2d 1135 (Fla.1999) (table report of unpublished order), and our decision in Peede v. State, 748 So.2d 253 (Fla.1999), to support his claim. Kokal contends that in those cases, the death-sentenced defendants was, in effect, given a second chance on their postconviction motions due to ineffectiveness on the part of postconviction trial counsel. Kokal's argument is misplaced. Neither Fotopoulos nor Peede involved claims of ineffective assistance of postconviction counsel. Rather, in Fotopoulos, this Court recognized that during oral argument of the postconviction appeal, counsel raised claims not raised at the trial level. Therefore, we dismissed the appeal and allowed Fotopoulos to file a successive, although limited, postconviction motion. See Fotopoulos v. State, No. 91,227, 741 So.2d 1135 (Fla. order filed Aug. 25, 1999). The order entered in Fotopoulos did not address the issue of ineffective assistance of counsel during postconviction litigation. Further, although this Court, in Peede, did briefly address the failures of Peede's postconviction representation, see Peede, 748 So.2d at 256 n. 5, we remanded the *778 cause to the trial court because that court had failed to hold an evidentiary hearing on many of Peede's claims. We did not allow Peede to file a successive postconviction motion to argue ineffective assistance of his first postconviction counsel, as Kokal has done. The cases of Fotopoulos and Peede differ significantly from the procedural posture presented here, and therefore offer Kokal no support.
Kokal is requesting that this Court recognize a claim of ineffective assistance of postconviction counsel, which we have consistently been unwilling to do. Allowing Kokal's claim to survive will open this Court to a barrage of claims from all inmates, seeking successive postconviction hearings due to the purported ineffective assistance of initial postconviction counsel. Because a defendant does not have a constitutional right to counsel during postconviction proceedings, he clearly does not have a claim for ineffective postconviction representation.
In a postconviction proceeding, all that due process requires is that the defendant be provided meaningful access to the judicial process. See Butterworth, 714 So.2d at 408. Here, Jefferson Morrow represented Kokal in his first postconviction action and appeal, and it is clear that Morrow's representation did not rise to the level of complete abandonment of his client and that Kokal was provided meaningful access to the judicial process.
Following this Court's denial of rehearing in Kokal's direct appeal action, then-Governor Martinez signed Kokal's death warrant. A postconviction motion was quickly filed on Kokal's behalf, and the trial court entered an order on October 12, 1988, staying the execution indefinitely and ordering an evidentiary hearing on the postconviction motion. See Kokal II, 562 So.2d at 325. Subsequently, an amended postconviction motion was filed on May 18, 1992. Although Kokal was initially represented by CCRC, a conflict forced CCRC to withdraw in 1996, and Morrow was subsequently appointed to represent Kokal. In February 1997, an evidentiary hearing was held on Kokal's amended postconviction motion. At that hearing, Morrow presented six witnesses, including two mental health experts; Kokal's mother and father; an assistant public defender; and Dale Westling, Kokal's trial attorney. The transcript of the evidentiary hearing reveals that Morrow questioned the witnesses at length and entered numerous objectionssome sustained, some overruledto questions posed on cross-examination by the State. Further, Morrow filed a lengthy post-evidentiary hearing written closing argument. After the trial court denied Kokal's postconviction motion, Morrow filed a timely notice of appeal to this Court and continued to represent Kokal through that appeal. Morrow's brief to this Court was over fifty pages in length and presented four claims. Additionally, Morrow moved to supplement the record on appeal to ensure that this Court had Kokal's medical records to support one of the claims on appeal. While an attorney's actions can always be challenged in hindsight, it is clear here that Kokal was not denied due process during his first postconviction action, since he unquestionably was not denied meaningful access to the courts as a result of his counsel's actions. Therefore, this claim was properly denied by the trial court.

STATE'S FAILURE TO PRESERVE EVIDENCE
Kokal's fourth claim is that the State violated his due process rights by failing to preserve evidence that could potentially have been subjected to DNA testing. The precise claim that Kokal presents to this Court, however, was not litigated below. We have repeatedly held that "[i]n order to preserve an issue for *779 appellate review, the specific legal argument or ground upon which it is based must be presented to the trial court." Bertolotti v. Dugger, 514 So.2d 1095, 1096 (Fla.1987) (emphasis supplied); see also Anderson v. State, 863 So.2d 169, 181 (Fla.2003), cert. denied, 541 U.S. 940, 124 S.Ct. 1662, 158 L.Ed.2d 363 (2004). Since Kokal did not present this specific claim below, it is procedurally barred.
On April 6, 2000, Kokal filed with the trial court a motion to inspect, examine, and perform DNA testing of the evidence. He sought to have the blood that was found on his sneakers after the murder compared to a sample of the victim's DNA. Over the course of the next nine months, several discussions were had at various hearings regarding the location of the evidence to be tested and whether the sneakers even contained enough blood evidence to be tested. The matter culminated in a letter written by Kokal's postconviction counsel to the trial judge that read: "After reviewing the FDLE reports and based upon the State's representation that the victim's blood sample has been destroyed it appears at this time that there is no sample with which to compare any potential test results." No further action was taken with respect to the DNA issue, and the judge entered his final order denying Kokal's successive postconviction motion on February 12, 2001, and Kokal began the process of appealing that denial to this Court.
Before Kokal's appeal could be considered by this Court, Kokal filed in the trial court a motion for DNA testing and in this Court a motion to hold oral argument in abeyance. This Court granted the motion to hold oral argument in abeyance and temporarily relinquished jurisdiction to the trial court to resolve the DNA issue. The trial court ordered the release and DNA testing of the relevant evidence. Subsequently, Kokal's attorney filed a motion for an evidentiary hearing to determine where the evidence collected in the homicide investigation was located. In that motion, counsel represented to the court that she had been informed by the FDLE that the victim's blood sample was no longer suitable for testing, but that a saliva sample of the victim had been taken and could be used for comparison testing. However, counsel had been unable to locate the saliva sample. The judge granted the motion, and an evidentiary hearing was held in June 2003 to attempt to determine the location of the saliva sample.
On July 3, 2003, the trial court entered its order on Kokal's motion for DNA testing. Based upon the representations by the defense regarding the blood and saliva samples, the court found that the victim's blood sample had degraded to such a condition that DNA testing was not possible. Further, the court found that the saliva sample no longer existed and that it was last known to be in the possession of the FDLE on May 1, 1984. The court held that because the blood and saliva were not available, there was no sample of the victim's DNA to use for comparison. Importantly, the court also found that even if DNA evidence had demonstrated that the blood on Kokal's sneakers was not that of the victim, it was not reasonably possible that Kokal would have been acquitted or would have received a lesser sentence had that evidence been admitted at trial, since there was overwhelming evidence against Kokal, including his own admission of guilt.
Clearly, Kokal's motion below, denied by the trial court, was a request for access to evidence and for DNA testing. However, here, rather than appeal the trial court's denial of his motion for DNA testing, Kokal now argues that his due process rights were violated by the State's failure to preserve the relevant evidence, namely the *780 blood and saliva samples from the victim. This issue was not presented below, and, therefore, no evidentiary hearing was held to address this claim, and the trial court made no ruling with respect to the State's preservation, or lack thereof, of the blood and saliva samples. In support of his claim in this Court, Kokal relies upon facts not in evidence. The State has had virtually no opportunity to challenge many of the facts that Kokal relies upon to support his claim, has had no opportunity to interview potential witnesses or present a response beyond that presented in its answer brief to this Court. Because Kokal failed to present in the trial court the specific legal argument he now raises here, this claim is procedurally barred. See Bertolotti, 514 So.2d at 1096. Kokal has not challenged the trial court's order denying his motion for DNA testing, and our review of the record reveals that Kokal's motion was not improperly denied.

CONSTITUTIONALITY OF FLORIDA'S DEATH PENALTY STATUTE
Kokal's claim that Florida's death penalty sentencing scheme is unconstitutional under the United States Supreme Court's recent decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), is without merit. This Court recently addressed Kokal's contention in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. Kokal is likewise not entitled to relief on this claim.

CONCLUSION
In summary, we affirm the trial court's denial of Kokal's motion to disqualify the trial judge, and further affirm the court's denial of Kokal's successive postconviction motion. Finally, we reject as procedurally barred Kokal's due process claim based upon the State's alleged failure to preserve evidence.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., concurs specially with an opinion, in which CANTERO and BELL, JJ., concur.
ANSTEAD, J., concurs in result only.
PARIENTE, C.J., specially concurring.
I concur in the majority opinion and write separately to explain the grounds on which I concur in the denial of relief under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). A majority of this Court has now concluded that Ring does not apply retroactively in Florida to cases that are final, under the test of Witt v. State, 387 So.2d 922 (Fla.1980). See Monlyn v. State, 29 Fla. L. Weekly S741, S743-44 (Fla. Dec. 2, 2004) (Pariente, C.J., specially concurring, with Quince, J., concurring) (Cantero, J., concurring, with Wells and Bell, JJ., concurring). Accordingly, Kokal's Ring claim is procedurally barred in postconviction proceedings.
Independent of the procedural bar, the unanimous death recommendation in this case satisfies Ring's requirement that the jury find an aggravating circumstance necessary for imposition of the death sentence. This Court has previously relied in part on unanimous death recommendations in denying relief under Ring. See Anderson v. State, 863 So.2d 169, 189 (Fla.2003), cert. denied, 541 U.S. 940, 124 S.Ct. 1662, 158 L.Ed.2d 363 (2004); Rivera v. State, 859 So.2d 495, 508 (Fla.2003).
CANTERO and BELL, JJ., concur.
NOTES
[1] Kokal also petitioned this Court for a writ of habeas corpus, presenting eight claims. See Kokal III, 718 So.2d at 139, 140 n. 10. We denied the habeas petition. See id. at 139.
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] The four claims presented by Kokal in his amended successive postconviction motion were: (1) newly discovered evidence; (2) ineffective assistance of counsel during his first postconviction action; (3) execution by electrocution constitutes cruel or unusual punishment or both; and (4) execution by lethal injection is unconstitutional.
[4] It is not clear from the record what, if anything, the defense did from September 12, 2000, to October 31, 2000, with respect to the DNA issue. Although the defense requested access to the sneakers on September 12 so that they could be evaluated by an independent investigator, it appears from the record that that did not occur, as the defense did not even confirm the presence of the sneakers in the clerk's office until the morning of October 31.
[5] Prior to the hearing, Kokal filed another postconviction motion, challenging the constitutionality of Florida's death penalty statute in light of the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[6] In a later order, the court also denied Kokal's Ring claim asserted in the successive postconviction motion. Kokal filed a motion for rehearing on the Ring issue, which the court denied.
[7] Both the court and the State noted for the record that they had just received the motion approximately thirty minutes before the hearing began. The state attorney noted that he had only had the opportunity to scan through the motion.
[8] In the State's answer to Kokal's pro se successive postconviction motion, filed October 18, 1999, the State noted that O'Kelly had testified in the Kight action, and that Judge Carithers had presided over that action.
[9] Although the judge referred to the "potential testimony of William Robert O'Kelly, Jr.," he meant the potential testimony of Gary Hutto, who would be the one to actually testify at an evidentiary hearing.