[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-11722

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 18, 2010
JOHN LEY
CLERK

D. C. Docket No. 05-00173-CV-VMC

GREGORY ALAN KOKAL,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
FLORIDA ATTORNEY GENERAL,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 18, 2010)

Before TJOFLAT, BLACK and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In this capital case, Gregory Alan Kokal claims that he was denied the effective assistance of counsel in violation of the Sixth Amendment. Kokal was sentenced to die by a Florida state court for the first degree murder of Jeffrey Russell, a sailor in the United States Navy. During post-conviction proceedings, the Florida Supreme Court concluded that Kokal's trial counsel was not constitutionally ineffective in preparing for the sentencing phase of his trial. Kokal again raised a Strickland claim in this federal habeas corpus petition alleging that his trial counsel failed to investigate mitigating mental health evidence. The federal district court likewise denied this § 2254 petition in full. Kokal now appeals that judgment in our Court. After thorough review, we too conclude that the state court's determination was neither contrary to nor an unreasonable application of clearly established federal law. Accordingly, we affirm the district court's decision and deny the petition.

## I. Facts and Procedural History

### A. The Guilt Phase of the Trial

The awful facts of the murder, as elicited at trial, are these. At 7:15 a.m. on the morning of September 30, 1983, navy diver Robert Garon was jogging at the Hanna Park Recreational Facility near Jacksonville, Florida, when he discovered a

body lying on the beach. There was a pool of blood under the victim's head, and a broken cue stick lay near the body. After police were called to the scene, they discovered, on the park exit road, a wallet and a Naval Identification Card, identifying the victim as Jeffrey Russell, a sailor stationed at Mayport, a Naval base outside of Jacksonville.

The police initially believed that Russell had been beaten to death. An autopsy later revealed, however, that a gunshot was the cause of death, but this information was intentionally restricted to the doctor performing the autopsy and to investigating personnel. The autopsy further revealed that Russell had suffered multiple blunt impacts to the head. The victim also suffered multiple welt marks on the back of his forearm, multiple abrasions and contusions on his knuckles, a dislocated right ring finger, and multiple abrasions on his back. The medical examiner testified that based on these wounds, Russell was alive and tried to defend himself at the time they were inflicted.

As fate would have it, on the morning Russell's body was discovered, Jacksonville police officer David Mahn stopped a 1975 Ford pickup truck with Arizona tags because the driver had driven away from a gas station without paying for the gas. Petitioner Kokal was the only occupant of the truck. When asked for identification, Kokal produced his own Florida driver's license, a Colorado

3

driver's license belonging to William O'Kelly, and a New York driver's license belonging to the victim, Jeffrey Russell. Inside the truck the officer found a Reuger .357 revolver, which was later determined to have Kokal's fingerprints on it and identified as the weapon used to murder Russell. At the time of Kokal's traffic stop, however, Officer Mahn did not make any connection between Kokal and Jeffrey Russell's murder. As a result, after Officer Mahn arrested Kokal for petit theft of the gasoline, Kokal was released on his own recognizance.

That evening, Kokal was visited by a friend, Eugene Mosley, while Kokal was packing his truck to leave town. Kokal told Mosley that he and his companion, William O'Kelly, were going to Canada because Kokal had killed a man. Kokal explained that he and O'Kelly had beaten Russell with a pool cue, and both had beaten and kicked Russell after he was lying on the beach, but that Kokal had actually shot Russell in the head. In describing the murder to Mosley, Kokal said that the "guy wouldn't . . . hardly go down," and at one point, the victim was on his knees and pleaded for his life, saying "please don't kill me, don't kill me." Nevertheless, they "just kept beating him" and "finally got him on the ground and they continued to kick him and beat on him." Then Kokal "just . . . took a gun and held it to [the victim's] head and shot him."

4

Kokal told Mosley that "he wasn't worried about [fingerprints being found on the pool cue] because there was enough sand there and that sand will keep them from getting any fingerprints on any object." Kokal further surmised that "he was so close [when he shot Russell] and the bullet would have gone straight through his head and into the sand." According to Mosley, Kokal "didn't seem like it really bothered him that he did it." Indeed, when Mosley asked Kokal why he had shot the victim, Kokal offered this explanation: "dead men can't tell lies." Kokal admitted that the purpose of the attack had been to rob the victim, and that he had "wasted a guy . . . over a dollar." Kokal also told Mosley that "he was going to go get another Sailor before he left town so that they would have money to leave town on."

On October 5, 1983, Eugene Mosley called the police to report that he had information about someone having been shot in the head at the beach. The police determined that they needed to talk to Mosley since "nobody" would have known that Russell was shot in the head "but the person who did it." After speaking to Mosley, the police obtained an arrest warrant for Kokal and arrested him.

On October 20, 1983, Kokal was indicted and charged with the first degree murder of Jeffrey Russell. Kokal's testimony at trial was largely consistent with the facts of the murder detailed by Mosley -- that Kokal and O'Kelly had picked up

5

a hitchhiker, Russell, who was struck with a pistol and Kokal's pool cue, robbed, marched down a beach where he was again beaten with the pool cue, and then killed with a single shot from a .357 revolver. However, Kokal testified that it was his companion, O'Kelly, who actually beat, robbed, and shot the victim. Kokal admitted to being present during the murder, but denied any involvement in the homicide.

O'Kelly, on behalf of the government, also testified.[1] O'Kelly said that he had been with Kokal on the night of the murder, and that after they picked up Russell, the three of them had stopped to smoke marijuana, and then drove into Hanna Park. Once they were at the park, O'Kelly left to use the restroom, and upon his return, he saw Kokal hit Russell over the head with a pistol, and heard Kokal instruct Russell to hand over his wallet. O'Kelly then told Russell to give Kokal the wallet, so that "he would be on his way and we would be on our way." Instead, O'Kelly watched as Kokal made Russell walk down the beach, and a few minutes later, as Kokal beat Russell over the head with a cue stick. O'Kelly told Kokal that "there ain't no need for that" and that he was leaving. After he started to walk away, O'Kelly heard a gunshot, turned around, and saw that Kokal had a

---

[1] About six months before Kokal's trial, O'Kelly pleaded to the lesser included offense of Second Degree Murder with the understanding that prosecutors would recommend a sentence "in accordance with the [Florida] sentencing guidelines" range of 12 to 17 years. In exchange for the plea, the State of Florida required that O'Kelly "testify truthfully" against Kokal.

pistol in his hand.  Next, O'Kelly and Kokal ran to the truck and left.  O'Kelly

further testified that Kokal had brought up the subject of robbery three or four

times before the night of the murder.[2]  On October 4, 1984, the jury found

petitioner Kokal guilty of first degree murder.

## B.  The Penalty Phase and Direct Appeal

On October 12, 1984, the penalty phase began. The state presented the

testimony of the medical examiner, who gave further detail regarding the wounds

inflicted on the victim, including the defensive wounds on the victim's forearm and

hand.  The pathologist emphasized the seriousness of the beating that fractured the

victim's skull, which included "two impacts to the back of the head, one with

lacerations or tearing of the skull, the other one with an abrasion and bruise."  He

also described the very close range from which the victim was shot in the head, and

noted that the beating "happened prior to the shooting" because "there was

bleeding and reddening of the area suggesting that the man was alive when those

injuries were inflicted."

---

[2] O'Kelly was cross-examined at considerable length about a letter he had written to Kokal in November 1983, in which he wrote that it was he, O'Kelly, who had fired the weapon that night and had accidentally shot the victim in the head.   O'Kelly testified that at the time he wrote the letter, he was attempting to establish an explanation that would exonerate both him and Kokal of the crime.  He explained that he wanted to help Kokal, who was his friend.  O'Kelly also noted that on the night of his arrest, which was shortly after the murder, he told the police that Kokal had shot Russell, despite what he wrote in the letter.

Defense counsel in turn presented the testimony of Kokal's mother, Deanne Kokal. Mrs. Kokal testified that Kokal's father had physically abused Kokal as a child. She described an instance when the father had struck Kokal with a tennis racket, causing "severe gashes in his head." She also said that, when Kokal was around age eight, nine, or ten, on one occasion, his father chained him to the foot of his bed, "locked [him] in his room for one week without having anything to eat except sweet potatoes," and did not allow him to "use the bathroom."

Mrs. Kokal explained that petitioner's father would severely punish Kokal "every time he would do something"; these instances were frequent and included beatings. As the beatings increased in their severity and frequency, Kokal "kept getting into more and more trouble." She sought counseling for her son. The physical abuse of Kokal ended in 1977. Mrs. Kokal also recounted that her husband physically abused her as well, and this included striking her with his fist, although not as frequently as he abused Kokal. She added that a divorce ensued when Kokal was thirteen or fourteen years old.

Mrs. Kokal pleaded with the jury that Kokal had "love, compassion and . . . a lot to offer," including "his loyalty to me." She added that the murder was wholly inconsistent with "the man that [she had] . . . raised and known for all his life." She recognized that when Kokal returned from Arizona in July 1983 with

8

O'Kelly, his lifestyle had become one of daily alcohol abuse. "[H]e mostly would do what he wanted to." But she said she had not given up on her son, and begged the jury to let him live. She explained that Kokal loved the outdoors, and that a life sentence would be a "tremendous penalty" for him.

Following the testimony and arguments, the judge instructed the jury on the potential aggravating and mitigating circumstances. The aggravating circumstances included whether: (1) the capital felony was committed while the defendant was engaged in the commission of a robbery, Fla. Stat. § 921.141(5)(d); (2) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest, Fla. Stat. § 921.141(5)(e); (3) the capital felony was especially heinous, atrocious or cruel, Fla. Stat. § 921.141(5)(h); and (4) the capital felony was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. Fla. Stat. § 921.141(5)(i). The mitigators in turn included these considerations: (1) Kokal's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, Fla. Stat. § 921.141(6)(f); (2) Kokal's age at the time of the murder, Fla. Stat. § 921.141(6)(g); and (3) his character. Fla. Stat. § 921.141(6)(h).

After deliberating, the jury unanimously recommended death. It also found that "the defendant, Gregory Kokal did actually kill Jeffrey Russell."

9

On November 14, 1984, the state trial court conducted a motion and sentencing hearing of its own, pursuant to Fla. Stat. § 921.141(3), which requires trial judges to independently review the evidence and make detailed written findings regarding aggravating and mitigating circumstances before imposing the death penalty. In this hearing, the trial court weighed the fact that the jury had found Kokal actually killed the victim, and reviewed all of the potential statutory and non-statutory mitigating circumstances. Finding no mitigators and all four aggravating circumstances, the trial court sentenced Kokal to death.

The trial court also issued a written judgment and sentence, explaining its decision at some length. The court began by outlining the essential facts of the murder, including how Kokal "savagely" beat the victim, shot Russell in the head after the victim "begged his life be spared," and bragged to his friend that he "wasted a sailor for a dollar."

The order further provided that the trial court had "closely examined, weighed and considered" the aggravating and mitigating circumstances. In so doing, the trial court expressly addressed the aggravating circumstances argued by the state, as well as all of the potential mitigating circumstances available in the statute. The trial court then reached the following pertinent conclusions:

- In rejecting the "extreme mental and emotional disturbance" mitigating circumstance, Fla. Stat. § 921.141(6)(b), the judge

10

found that "the defendant was at all material times in complete control of his mental and emotional faculties acting deliberately and with pre-meditation."

• In rejecting the "substantially impaired" capacity mitigating circumstance, Fla. Stat. § 921.141(6)(f), the judge recognized that the defendant had "testified that during the evening prior to the death of Russell . . . he had consumed a large quantity of alcohol[,] . . . smoked a number of marijuana cigarettes[, and] . . . was highly intoxicated." The judge also found, however, that "[t]he defendant's statement to his friend, [Mosley], contained no evidence of intoxication [and] . . . was in great detail including his thought process at the time of the killing of Russell"; "[t]he testimony of the co-participant, [O'Kelly], does not support intoxication of the defendant by either alcohol or drugs [and showed] . . . deliberate, calculated acts and conduct by the defendant during the course of the robbery and murder of Russell"; and "the defendant proved to this Court, by his statements and his acts, as well as his demeanor on the witness stand, that he is an individual of above average intelligence, knowledge, and well oriented as to time, space and relationships and well able but unwilling to conform his conduct to the requirements of law and with an ability to appreciate the criminality of his conduct."

• In finding the "capital felony [during] . . . the commission of . . . a robbery" aggravating circumstance, Fla. Stat. § 921.141(5)(d), the judge found that the evidence "proves beyond a reasonable doubt that the death of Jeffrey Russell took place during the commission of the robbery of" Russell; and that Kokal knowingly participated in the robbery and "actually committed the murder."

• In finding the "capital felony [to] avoid[] . . . arrest" aggravating circumstance, Fla. Stat. § 921.141(5)(e), the judge found that Russell "was beaten severely about the head and shoulders during the robbery" and "[a]t the time of the murder, . . . lay prone upon the ground and was begging for his life";

11

"Russell's shooting was not necessary for escape from the scene of the robbery, and . . . eliminated the victim's identification and testimony at trial"; and Kokal told Mosley "that he had shot Russell because, 'dead men tell no lies.'"

- In finding the "heinous, atrocious, and cruel" aggravating circumstance, Fla. Stat. § 921.141(5)(h), the judge found that "the victim was severely beaten about the head and neck[,] . . . suffered great pain from the blows[,] . . . was forced to change his location before he was finally struck down and murdered"; "[t]he march was a 'death march' filling Russell's mind with fear and anguish"; and "[a]t the end of the 'death march,' Russell was beaten again and as he begged for his life, the murder took place."

- And in finding the "cold, calculated, and premeditated" aggravating circumstance, Fla. Stat. § 921.141(5)(i), the judge found that "Russell was assaulted and battered after he alighted from the truck upon arrival from the beach[,] . . . was forced by the defendant to move farther down the beach away from the truck[,] . . . was completely subdued and presented no threat to the defendant[,] . . . was struck repeatedly by the defendant until he fell to the ground[,] . . . [and] offered no threat to the defendant and, to the contrary, begged for his own life"; and "[t]he murder of Russell was in the nature of an assassination. He was forced into the 'death march' and, at its conclusion, was assassinated as he begged for his life. He constituted no threat to the defendant nor bar to his escape. At no time, did Russell ever present legal or moral cause to the defendant or his companion, O'Kelly, to justify Russell's death."

Having explained that the state had proven the four aggravating circumstances beyond a reasonable doubt, and that the defendant had not proven any statutory or non-statutory mitigating circumstances, the order concluded that Kokal should be sentenced to die. On July 17, 1986, the Florida Supreme Court

12

affirmed the petitioner's conviction and death sentence. <u>Kokal v. State</u>, 492 So.2d 1317 (Fla. 1986).

In its affirmance, the Florida Supreme Court expressly rejected Kokal's attempts to rebut three of the aggravating circumstances:

> The victim was beaten unconscious and posed no threat to Kokal's escape, but he did pose a threat to later identification of the robber(s). Kokal's own statement to his friend to the effect that dead men can't talk confirms that the murder was committed to avoid or prevent arrest. We have found this aggravating circumstance present in similar cases.
>
> Appellant's argument that the murder was not especially heinous, atrocious or cruel because death was instantaneous overlooks the events preceding death. The murder was preceded by a violent robbery, a march at gunpoint to the murder site, and a vicious and painful beating during which the victim, in anticipation of his fate, unsuccessfully pleaded for his life. The facts surrounding the murder also show beyond a reasonable doubt the heightened premeditation necessary for a finding of cold, calculated and premeditated. The high level of visceral viciousness with which the murder was carried out is not inconsistent with the coldly calculated decision to eliminate the witness by beating him into unconsciousness prior to the execution-type killing.

<u>Id.</u> at 1319 (internal citations omitted).

The Florida Supreme Court also upheld the state trial court's rejection of mitigating circumstances in these terms:

> Appellant also argues that the trial court erred in not finding certain mitigating factors: his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired and his age of twenty years. The trial court heard testimony

13

from appellant and his mother that he abused alcohol and drugs up to and during the night of the murder. The specificity with which Kokal recounted the details of the robbery and murder to his friend contradicts the notion that he did not know what he was doing, as does the testimony of his companion. There was no abuse of discretion in not giving significant weight to this evidence in mitigation. . . . For the same reason we see no merit in the claim that the trial court erred in not finding as mitigation that appellant was only twenty years of age and immature.

Id. (internal citations omitted).

The Florida Supreme Court denied rehearing in Kokal's direct appeal on September 17, 1986. See Ex. 14.[3]

## C. Kokal's Ineffective Assistance Claim In the State Post-Conviction Courts

Following the resolution of Kokal's direct appeal, Kokal filed a post-conviction motion in state court raising, among other things, the claim that his counsel was ineffective at the penalty phase of his trial because counsel failed to investigate and present mitigating evidence concerning Kokal's mental health at the time of the crime. In February 1997, an evidentiary hearing was held on Kokal's post-conviction claims ("the Rule 3.850 hearing").

Dr. Barry Crown, a neuropsychologist, testified as a witness for Kokal. In Crown's opinion, Kokal had sustained organic brain damage, primarily of a frontal lobe bilateral variety, prior to the crime. Crown noted that Kokal had been in a car

---

[3] We refer to the Respondent's exhibits in the district court record as "Ex. __," and we refer to the docket entries in the district court as "Doc. __."

accident in 1983, which had resulted in concussions, and had an earlier near-drowning experience, which had deprived his brain of oxygen.[4] According to Dr. Crown, the brain damage Kokal suffered rose to a level that would have affected Kokal's cognitive abilities, and affected Kokal's concentration, attention, reasoning, judgment, auditory selective attention,[5] and basic verbal and nonverbal memory process. Crown further offered that alcohol and drugs "have a greater effect on an individual who has recently sustained a head injury than they would have on the normal individual. A smaller amount of substance creates a greater effect." Dr. Crown thus opined that Kokal's consumption of a large quantity of alcohol on the evening of the murder, in combination with his brain damage, would have greatly affected his cognitive abilities.

In short, in Dr. Crown's opinion, Kokal was suffering from two statutory mitigating factors at the time of the crime: Kokal was under the influence of an extreme mental and emotional disturbance, Fla. Stat. § 921.141(6)(b), and Kokal's capacity was diminished to appreciate the criminality of his conduct or to conform

---

[4] Crown conceded, however, that Kokal underwent a physical examination and x-rays after the near-drowning experience, but nothing unusual -- like aspiration pneumonitis, acidosis, or a skull fracture -- was found. He further acknowledged that hospital records following the car accident ruled out a significant head injury, indicated that Kokal's condition was due to alcohol consumption, not head injury, and reported that Kokal was doing well when discharged. Indeed, it is undisputed that in the car accident, Kokal had been driving under the influence of alcohol.

[5] This signifies that Kokal may be attentive to some details and inattentive to others, particularly when there are distractions.

15

his conduct to the requirements of the law, Fla. Stat. § 921.141(6)(f). Crown admitted on cross-examination, however, that Kokal's brain damage was not severe enough standing alone to have impaired him at the time of the crime. He further conceded that Kokal was not insane at the time of the offense.

Dr. Joseph Virzi, a psychiatrist who had examined Kokal pre-trial in 1984, also testified on behalf of Kokal at the Rule 3.850 hearing. Virzi had been retained before trial by Kokal's counsel, Dale Westling, to evaluate whether Kokal was insane at the time of the crime, but Virzi was not called to testify at the penalty phase. Following the pre-trial examination, Dr. Virzi had given Kokal's counsel a report saying the following about Kokal's "mental status":

> This twenty-one year old white male was oriented to time, person, and place. Intelligence was not impaired. Recent and remote memory were clear. The patient had a clear idea of what had happened prior to the above incident and during the above incident. He understands the consequences of his behavior. He knows the difference between right and wrong. The patient has no delusions, no homicidal ideas. His [blank] is clear.

The report opined that Kokal suffered from "[a]cute situational adult/adolescent problems [and c]hronic alcoholism and drug abuse."[6]

---

[6] The report also said:

> The patient does not meet the criteria for McNaughton Rule of insanity. The patient appeared cooperative, and it appeared that the above history is valid. I have no suspicion that the patient is lying. However, I would like to corroborate my history with the Minnesota Multi-Phase Personality Inventory [("MMPI")] test, which could pick up malingering and lying.

16

At the Rule 3.850 hearing, Virzi testified that his pre-trial examination of Kokal had lasted about forty-five minutes, and that he had not received any background information on Kokal prior to the examination. Since that time, and prior to the Rule 3.850 hearing, Dr. Virzi had received Kokal's records, and was made aware of Kokal's near-drowning and severe automobile accident. Virzi added that, based on the records supplied to him in post-conviction, he found the presence of at least one statutory mental health mitigator at the time of the crime, Fla. Stat. § 921.141(6)(b).

Specifically, when Virzi was asked whether he had an opinion based upon a reasonable degree of medical probability as to whether Kokal suffered from a diminished capacity at the time of the crime, he answered that the information on Kokal's accidents "would raise my level of awareness that he may have diminished capacity, cognitively, at the time of the crime." And when asked if he had an opinion, within a reasonable degree of medical probability, as to whether the substance and alcohol abuse diminished Kokal's capacity or disturbed him

On cross-examination, Dr. Virzi admitted that he vaguely recalled trying to give the MMPI test to Kokal in the waiting room the day he met with him, but did not believe that Kokal ended up taking the test. Notably, this statement conflicted with Dr. Virzi's earlier deposition where he said that he believed he had given Kokal the MMPI test in the waiting room.

emotionally at the time of the crime, Dr. Virzi's opinion was that "the alcoholism, drug abuse disturbed him emotionally at the time of the crime."

Dr. Virzi acknowledged on cross-examination that he had examined Kokal in 1984 at counsel Westling's request for possible mitigation as well as for sanity. In fact, his written report provided the following details about Kokal's substance abuse:

> The patient [Kokal] states that the relationship [with his father] is not the greatest. He stated that the relationship deteriorated with the patient's drinking. He stated that he greatly disappointed his father, but his father did not give him much support during his turbulent adolescent development . . . . The patient said his alcohol history started in junior high school around the eighth grade. He stated he originally drank not to stay drunk, but it gradually moved into that area, with difficulty controlling his drinking and resulting belligerent fighting behavior. He stated he drinks mostly beer, approximately a six-pack a day, but denies any blackouts or D.T.'s, but he does admit to one DWI. . . . He said he had no formal treatment for psychiatric or drug and alcohol problems. . . . He . . . continues to take drugs and pot irregularly.

Virzi thought he had "implied" in his report that Kokal was incapacitated from drugs and alcohol at the time of the crime.

In addition, Virzi still agreed with what he found in his report -- that Kokal suffered from chronic alcoholism and drug abuse -- and there was no change in his original diagnosis. Dr. Virzi further conceded that when he examined Kokal in 1984 he found no evidence of organic brain disorder. However, when Dr. Virzi

18

was asked whether he continued to believe Kokal had a clear and precise memory of what happened, he said that based on what Kokal's post-conviction lawyers had told him, he now "question[ed] whether that was correct memory or not."

Kokal also called his trial counsel, Dale Westling, to testify at the Rule 3.850 hearing. Westling testified that during his many discussions with Kokal, the petitioner had given him a detailed account of how he had beaten the victim with a pool cue and then shot him in the head. When asked why he did it, Kokal told Westling, "Dead men tell no lies. That's why I did it," and then added, "and you know what, the mother fucker only had a dollar." Westling said that the account was "chilling," since "there was no emotion whatsoever, no remorse."

As for Kokal's allegeded alcohol and drug impairments at the time of the crime, Westling believed that Kokal "knew every step that occurred that evening with great specificity." Westling explained that, during all of his interactions with Kokal, "[t]here was never the slightest indication that [Kokal] was in any way impaired." "He knew exactly what had happened and he did it to steal money."

Westling had asked Kokal at the outset if he had any physical or mental disabilities or handicaps and Kokal had told him no. Westling "spent a lot of time with Mrs. Kokal." He added that the father was not helpful. Neither Kokal, his mother, nor his father told Westling about the near-drowning in 1977 nor the car

19

accident in 1983. Westling said he never had "the slightest indication" that Kokal was incompetent or suffering from some mental incapacity.

Nonetheless, Westling had requested that the court appoint an expert to perform a psychiatric examination of Kokal because it was "common sense . . . to every defense attorney that defends a murder at least to have [the client] examined by a psychiatrist." According to Westling, after receiving Dr. Virzi's report, Westling phoned Virzi to ask if he had anything at all that could help in the defense and Virzi "got a little snotty" and said no.[7]

Westling opined that if called, Dr. Virzi "would have been a devastating witness" against the defense, since Virzi's report would have been discoverable and would have provided grounds for "three or four aggravating circumstances in and of itself." He continued: "I didn't want [the jury] to know that Dr. Virzi thought [Kokal] had a clear idea of what had happened prior to the [murder] and during the [murder]."

Westling also considered the child abuse Kokal had suffered at the hands of his father as one possible non-statutory mitigating circumstance, and looked for others. Westling and Kokal decided "to present [Kokal's] mother with the

---

[7] According to counsel, Westling "knew [Kokal] was lying to [Dr. Virzi]," because Kokal had told Dr. Virzi that he had not killed Russell. As a result, Westling "wasn't overly impressed with the need to do [the MMPI test]," but regardless, Westling "think[s] he may have done it."

evidence that we had about the abuse, his age and try to present to the jury some reason . . . not to give him the death penalty." Westling explained: "All we wanted to do was talk about [Kokal]'s past, and what it comes down to is to evoke sympathy." But Westling and Kokal did not want to open the door to Kokal's criminal history or misbehavior as a child through his mother's testimony. Westling also expressed concern about "the inconsistencies [they] might create by arguing [Kokal] did it but there are excuses for it." He said: "You can't take the position at trial I didn't do it and then in mitigation try to explain why you did it."

Westling described Kokal as "very astute throughout the whole case[,] wanting copies of everything and question[ing] me about the practices and policies we were going to follow," and "incredibly bright, responsive, always appropriate in his remarks and responsive in responses, interested in the case." However, by "21 Greg was an accomplished criminal."

Finally, Kokal's mother, Deanne Kokal, testified at the Rule 3.850 hearing, recalling that she had told trial counsel about Kokal's alcohol and drug abuse problems. She remembered Kokal's near-drowning incident in 1977, but did not know whether she told Westling about it. She also recalled the 1983 car accident, but again did not think she had discussed it with Westling because "I guess I didn't

21

realize that it actually -- you know, he could have been damaged." Mrs. Kokal said it was a miracle that her son lived because it was very severe.

Following this testimony, the state trial court issued a written decision rejecting all of Kokal's post-conviction claims. Ex. 20. Addressing what it considered to be Kokal's "most serious" claim -- whether counsel's penalty-phase investigation into Kokal's mental health was deficient under Strickland v. Washington, 466 U.S. 668 (1984) -- the trial court observed that Kokal "failed to demonstrate how his trial counsel could have hoped to have developed mitigating evidence associated with actual brain damage," and "failed to establish with regard to trial counsel's use of the psychiatrist 'that the approach taken by defense counsel would not have been used by professionally competent counsel.'" Ex. 20 at 9, 11 (quotations omitted). Nonetheless, the trial court found that "the defense lawyer's over-all preparation for the penalty phase of the trial may have fallen below that expected of reasonably competent counsel [since t]he lawyer did little more than simply think about the penalty phase until after the guilt phase was completed." Ex. 20 at 9. The trial court continued: "Questions regarding any deficiency in Mr. Westling's preparation are irrelevant, though, if the Defendant cannot prove the existence of the second prong of the Strickland v. Washington test for ineffectiveness of counsel." Id.

22

Turning to Strickland's prejudice prong -- requiring Kokal to "show that [he] was prejudiced by any failure to prepare" -- the trial court found the following: (1) Dr. Virzi's opinion -- that, based on his history of alcohol and drug abuse, Kokal had some generally diminished mental capacity -- had not changed, despite what Dr. Virzi had recently learned about Kokal's brain damage; (2) Kokal's apparent ability to vividly recall the events of the murder, combined with his ability to function in terms of walking, talking, and driving a car, militated against any concept of specific diminished mental capacity with regard to his crime; (3) Kokal's history of alcohol and drug abuse was presented during the penalty phase of the trial, although not through the psychiatrist; and (4) Dr. Virzi was not called to testify at trial for strategic reasons, since had he testified, he could have been effectively cross-examined, and his report indicated his belief that Kokal understood the consequences of his actions. Ex. 20 at 9-10. The trial court concluded that Kokal

> failed to show how he was prejudiced by any alleged failure of trial counsel to have made better use of his psychiatrist. As the Supreme Court noted in affirming this conviction on direct appeal, the Defendant's detailed memory about the crime "contradicts the notion that he did not know what he was doing."

> Likewise, the Defendant has failed to adduce any other evidence as to how he may have been prejudiced by any supposed deficiency in preparation for the penalty phase.

Ex. 20 at 11 (citations omitted).

In short, there is no square finding from the trial court about whether counsel satisfied Strickland performance. The most we can say is that it raised the question, but then disposed of Kokal's claim by finding that he failed to establish Strickland prejudice.

Kokal appealed to the Florida Supreme Court, which after making a detailed and independent examination of the record, affirmed the trial court's decision. See Kokal v. Dugger, 718 So.2d 138, 139 (Fla. 1998). The Florida Supreme Court recited the evidence it considered relevant to Kokal's ineffective assistance claim. It began by laying out the facts of the murder, including that Kokal and O'Kelly had picked up, and then beaten, shot, and robbed a hitchhiker, who Kokal had deliberately shot in the head because "dead men can't tell lies." Id. The Florida Supreme Court observed that the trial court had found no mitigating circumstances, but had found four statutory aggravators: (1) the murder was committed during the course of a robbery; (2) the murder was committed to avoid arrest; (3) the murder was especially heinous, atrocious, or cruel; and (4) the murder was committed in a cold, calculated, and premeditated manner. Id. at 139 & n.1. It also recognized that Kokal's mother had testified during the penalty phase that his father had badly mistreated and abused him as a child. Id. at 139.

The Florida Supreme Court then summarized the testimony from Kokal's post-conviction hearing of Crown and Virzi this way:

> Kokal called as a witness Dr. Crown, a neuropsychologist who examined him in prison in 1996, and who testified that in his opinion Kokal sustained brain damage in a 1983 car wreck, and that on the night of the killing the combination of brain damage and alcohol consumption rendered him extremely disturbed and also impaired his capacity to appreciate the criminality of his conduct. This testimony was controverted by the State on cross-examination.FN2  Kokal also called Dr. Virzi, a psychiatrist, who testified that he had examined Kokal pre-trial in 1984 to evaluate his sanity and competence. Dr. Virzi now believes that Kokal's drug and alcohol abuse caused him to be emotionally disturbed and to have diminished capacity at the time of the crime. This testimony also was controverted by the State.FN3
>
> > FN2. Dr. Crown admitted on cross-examination that he did not prepare a written report on Kokal -- that CCR did not ask him to -- and thus no report was given to the State prior to the evidentiary hearing. He testified that Kokal's brain damage is not severe enough standing alone to have impaired him at the time of the crime and that the only evidence of alcohol consumption came from Kokal himself.  Dr. Crown acknowledged that Kokal had successfully completed both his G.E.D. and a number of college courses. Dr. Crown did not know that Kokal had in fact feigned illness in order to obtain favored treatment in jail. Dr. Crown attributed no significance to the fact that hospital records following the 1983 auto accident: ruled out significant head injury, indicated that Kokal's condition was due to alcohol consumption, not head injury, and reported that Kokal was doing well when discharged. Nor did Dr. Crown attach significance to the fact that prison evaluations showed that Kokal was not suffering from any mental disorders and did not need counseling.

25

> FN3. Dr. Virzi acknowledged on cross-examination that he had examined Kokal in 1984 at the request of Dale Westling, defense counsel, and that he had evaluated Kokal for possible mitigation as well as for sanity and competence. Dr. Virzi knew of Kokal's history of drug and alcohol abuse at the time. He still agrees with everything he found in his original report and he concedes that when he examined Kokal in 1984 he found no evidence of organic brain disorder -- that Kokal was functioning normally.

Id. The state high court also detailed the testimony of counsel Westling concerning his own prior experience in trying criminal cases, Kokal's admission of the crime to him, Westling's preparation of the case and his trial strategy, and Kokal's demeanor as a defendant. Id. at 139-40.

In affirming the denial of Kokal's post-conviction motion, the Florida Supreme Court said: "Our review of the record shows that the trial court did not err in denying Kokal's claim of ineffectiveness in the guilt phase or in the penalty phase. The record contains extensive evidence to support its ruling and we find no legal error." Id. at 140-42 (footnotes omitted). In the accompanying footnotes, the Florida Supreme Court quoted at length from Strickland v. Washington, which established the Supreme Court's ineffective assistance standard,[8] as well as from

_____

[8] The Florida Supreme Court said the following:

The United States Supreme Court in Strickland set forth the following standard for ineffectiveness:

A convicted defendant's claim that counsel's assistance was so

26

the lower court's findings on Kokal's ineffective assistance claim.  Id. at 140-41

nn.11&13.

## D.    District Court Post-Conviction Proceedings

On February 22, 2005, Kokal filed the instant petition for writ of habeas

corpus under 28 U.S.C. § 2254 in the United States District Court for the Middle

District of Florida.  He filed an amended petition on March 10, 2005, raising nine

issues.[9]  On February 11, 2008, the district court denied relief on all nine.

---

> defective as to require reversal of a conviction or death sentence
> has two components.  First, the defendant must show that
> counsel's performance was deficient.  This requires showing that
> counsel made errors so serious that counsel was not functioning as
> the "counsel" guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that the deficient performance
> prejudiced the defense. This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable.

[Strickland,] 466 U.S. at 687 . . . .  The federal Court further expounded on the
second prong, i.e., the prejudice prong, of this standard:

> The defendant must show that there is a reasonable probability
> that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different. A reasonable probability is
> a probability sufficient to undermine confidence in the outcome.

Id. 466 U.S. at 694 . . . .

Kokal, 718 So. 2d at 140 n.11.

[9] Kokal raised the following claims in his federal petition: (1) ineffective assistance of
counsel at the penalty phase; (2) ineffective assistance of counsel at the guilt phase; (3) the trial
court's failure to excuse certain jurors for cause; (4) the trial court's exclusion of certain jurors
for cause; (5) the trial court's refusal to excuse, and exclusion of, certain jurors based on race;
(6) prosecutorial misconduct; (7) the denial of his right to a full and fair post-conviction process;
(8) the denial of his newly discovered evidence claim in violation of the Eighth Amendment; and

27

As for Kokal's claim that he received ineffective assistance of counsel at the penalty phase of his trial, the district court determined that the state courts' findings were neither contrary to nor an unreasonable application of clearly established federal law. It first determined that Westling had "reasonably decided not to further pursue any mental health matters." Doc. 18 at 31. The court further held that Kokal "was not prejudiced by counsel's alleged errors," explaining that:

> Even if the mental health evidence had been presented, there is no reasonable probability that it would have established sufficient mitigating factors to outweigh the four statutory aggravating factors. There is simply no reasonable probability that the result of the penalty proceeding would have been different if counsel had presented such evidence.

Doc. 18 at 31.

The district court issued a certificate of appealability on one issue: "(1) did the state courts' adjudications of Petitioner's ineffective assistance of counsel claim in ground one (that Petitioner was denied the effective assistance of counsel at the penalty phase of his capital trial) result in decisions that were contrary to clearly established federal law, involved an unreasonable application of clearly established federal law, and/or were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings; and, if so, (2)

---

(9) the unconstitutionality of Florida's capital sentencing statute.

28

did this Court err in finding Petitioner's ineffective assistance of counsel claim in ground one to be without merit?"  Doc. 27.  This appeal followed.

## II.  Standard of Review

Because Kokal filed his federal habeas petition after April 24, 1996, Section 2254(d) governs this proceeding. Wilcox v. Fla. Dep't of Corr., 158 F.3d 1209, 1210 (11th Cir. 1998).  Accordingly, a court may grant habeas relief only where the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court decision is "contrary to" clearly established law if the court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or the state court confronted facts that are "materially indistinguishable from a relevant Supreme Court precedent" but arrived at a different result.  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court decision is an "unreasonable application" of clearly established law if the state court unreasonably extends or fails to extend a clearly established legal principle to a new context.  Id. at 407.

29

A state court's factual findings are presumed correct unless rebutted by the petitioner with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003) (citing Sumner v. Mata, 449 U.S. 539, 547 (1981)).

### III. Analysis

Kokal's claim boils down to this: his trial attorney was constitutionally ineffective during the penalty phase because counsel failed to conduct a reasonable investigation that would have revealed organic brain damage. To establish ineffective assistance, a petitioner must show both incompetence and prejudice: (1) he must show that "counsel's representation fell below an objective standard of reasonableness," and (2) he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 687-88, 694; accord Wiggins v. Smith, 539 U.S. 510, 521-522 (2003); Williams, 529 U.S. at 390-91; Darden v. Wainwright, 477 U.S. 168, 185-87 (1986).

Because a petitioner's failure to show either deficient performance or prejudice is fatal to a Strickland claim, a court need not address both Strickland prongs if the petitioner fails to satisfy either of them. See Windom v. Sec'y, Dep't

of Corr., 578 F.3d 1227, 1248 (11th Cir. 2009) (quoting Strickland, 466 U.S. at

697).  As a result, a court may resolve whether the petitioner established prejudice

as a result of counsel's errors without first considering the adequacy of his

counsel's performance.   Id.; see also McClain v. Hall, 552 F.3d 1245, 1251 (11th

Cir. 2008) ("We may decline to decide whether the performance of counsel was

deficient if we are convinced that [the petitioner] was not prejudiced").  Since the

Florida Supreme Court's determination that Kokal failed to establish Strickland

prejudice was not contrary to nor an unreasonable application of clearly established

law, we only address prejudice.

> To establish prejudice, Kokal must show

> that, but for counsel's unprofessional performance, there is a reasonable probability the result of the proceeding would have been different. See Strickland, 466 U.S. at 694 . . . . "It is not enough for the [petitioner] to show the errors had some conceivable effect on the outcome of the proceeding . . . ," because "[v]irtually every act or omission of counsel would meet that test." Id. at 693 . . . . Nevertheless, a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id. at 693 . . . .  Rather, where, as here, a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695 . . . .

Putman v. Head, 268 F.3d 1223, 1248 (11th Cir. 2001).  Thus, "[i]n assessing

prejudice, we reweigh the evidence in aggravation against the totality of available

31

mitigating evidence." Wiggins, 539 U.S. at 534. "In that process, what matters is not merely the number of aggravating or mitigating factors, but their weight." Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1240-41 (11th Cir. 2010). In addition, we presume "a reasonable sentencer." See Williams v. Allen, 542 F.3d 1326, 1342 (11th Cir. 2008) (citing Strickland, 466 U.S. at 695 ("[T]he idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency[,] . . . are irrelevant to the prejudice inquiry.")).

We review the highest state court decision reaching the merits of the petitioner's claim. See Shere v. Sec'y, Fla. Dep't of Corrs., 537 F.3d 1304, 1310 (11th Cir. 2008) ("[O]ur review is limited to examining whether the highest state court's resolution of a petitioner's claim is contrary to, or an unreasonable application of, clearly established law, as set forth by the United States Supreme Court."); see also Newland v. Hall, 527 F.3d 1162, 1199 (11th Cir. 2008) ("[T]he highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision.").

Here, the Florida Supreme Court's ruling on Kokal's Rule 3.850 motion is the highest state court decision reaching the merits of Kokal's ineffective assistance of counsel claim. The Florida Supreme Court opinion independently reviewed and recited the facts surrounding Kokal's ineffectiveness claim at length.

32

In so doing, the Florida Supreme Court actually appears to have disagreed with the trial court about whether the psychiatrist had changed his mind since 1984. The trial court suggested that Dr. Virzi continued to reach the same conclusions, see Ex. 20 at 10, while the Florida Supreme Court found that Dr. Virzi "now believes that Kokal's drug and alcohol abuse caused him to be emotionally disturbed and to have diminished capacity at the time of the crime," Kokal, 718 So. 2d at 139 (emphasis added). Moreover, the Florida Supreme Court discussed in detail the evidence that undermined the "new" mitigating evidence provided by Drs. Crown and Virzi, including the testimony of Kokal's counsel -- none of which had been detailed by the lower court. Compare id. at 139-40 nn. 2, 3, 6, 8, with Ex. 20 at 7-11. After explicating the facts, the Florida Supreme Court quoted at length from Strickland, observed that the record "contain[ed] extensive evidence" to support the trial court's decision denying Kokal relief, id. at 141-42, and concluded that Kokal had failed to establish a Strickland violation.

We are also obliged to afford AEDPA deference to the Florida Supreme Court's decision. Although the petitioner has argued loosely that the state courts failed to weigh the aggravators and mitigators as required by clearly established law, we remain unpersuaded.

33

We cannot say that the Florida Supreme Court failed to weigh the available mitigating and aggravating circumstances simply because it did not expressly say that it had. A review of its thorough opinion reveals quite the contrary. To begin with, the Florida Supreme Court properly quoted from the Strickland prejudice standard. See Kokal, 718 So. 2d at 140 n.11 (quoting Strickland, 466 U.S. at 694). In applying Strickland, the Florida Supreme Court then summarized the "new" mitigating evidence that Kokal had introduced at his Rule 3.850 hearing, and pointed out how the state had undermined the evidence proffered by Drs. Crown and Virzi. It also reviewed Westling's testimony, which added the opinion that Virzi would have been a devastating witness against Kokal, and that Kokal had always appeared to be astute and bright. Id. at 140 nn. 6, 8.

The Florida Supreme Court further considered the mitigating evidence that had been presented at the original sentencing phase -- that Kokal had been physically abused as a child. Id. at 139 ("During the penalty phase, his mother testified that he had been mistreated as a child."). It then recounted the egregious circumstances surrounding the murder, and discussed the statutory aggravators found by the trial court. Id. at 139 & n.1.

There is no way to read the Florida Supreme Court's detailed opinion without fairly concluding that it had "reweigh[ed] the evidence in aggravation

34

against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534.

Indeed, "[w]e will not presume that a state court misapplied federal law, and absent indication to the contrary will assume that state courts do understand clearly established Federal law . . . as determined by the Supreme Court of the United States." Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1256 n.3 (11th Cir. 2002) (quotation marks and citation omitted). Accordingly, we afford it AEDPA deference. See Panetti v. Quarterman, 551 U.S. 930, 953 (2007); see also Suggs v. McNeil, 609 F.3d 1218, 1228 (11th Cir. 2010) (affording deference to state court decision that said it had "evaluated the penalty phase of Suggs' trial as a whole," despite petitioner's claim that the court had "compartmentalize[d] the specific components and address[ed] the prejudice from counsel's deficiencies separately") (emphasis and quotation marks omitted).[10]

Our task, then, is to ask whether the Florida Supreme Court unreasonably weighed the aggravating evidence against the totality of evidence in mitigation. On the record before us, we hold that it did not.

_____

[10] Kokal's claim that the Florida trial court's prejudice determination failed to weigh the totality of mitigating evidence against the aggravating evidence (in violation of Strickland) -- and instead focused on whether Kokal changed the opinion of his competency/sanity expert -- is not relevant, since the Florida Supreme Court's decision is controlling, even if the lower state court decision had been incorrect. Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir. 1997) ("Of course, the latest holding of a state supreme court trumps any prior contrary holdings of lower state courts.") (citing Blue Cross and Blue Shield v. Nielsen, 116 F.3d 1406 (11th Cir. 1997) ("The final arbiter of state law is the state supreme court . . . .")).

35

To begin with, and as the state courts have repeatedly recognized, the aggravating circumstances in the murder of Jeffrey Russell are especially powerful. "[T]his is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak." Suggs, 609 F.3d at 1232 (quotation marks omitted). To the contrary, the trial court found four aggravating circumstances -- that (1) the capital felony was committed while the defendant was engaged in the commission of a robbery; (2) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (3) the capital felony was especially heinous, atrocious or cruel; and (4) the capital felony was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification.

In justifying these findings, the trial court recounted that the victim was "severely beaten" in the neck and head, "suffered great pain from the blows," endured a "'death march' filling Russell's mind with fear and anguish," pleaded to live while lying prone on the ground, and in the end was murdered even though he presented no physical threat to the defendant; that Kokal had bragged to his friend that he had shot Russell to eliminate a witness since "dead men tell no lies," had "wasted a sailor for a dollar," and had decided to go "get another sailor"; and that the jury had found "that the defendant had actually committed the murder." On

36

direct appeal (and again referenced in its post-conviction decision), the Florida Supreme Court reiterated the terrible circumstances of this "execution-type killing," which "was preceded by a violent robbery, a march at gunpoint to the murder site, and a vicious and painful beating during which the victim, in anticipation of his fate, unsuccessfully pleaded for his life." Kokal, 492 So. 2d at 1319. In short, the trial testimony detailed a calculated, heartless, and gruesome murder that involved robbery, torture, and, finally, a painful and senseless assassination.[11]

Furthermore, the mitigating evidence regarding Kokal's mental health was not compelling. Dr. Crown admitted on cross-examination that Kokal's brain damage was not severe enough standing alone to have impaired him at the time of the crime; rather, his mental capacity was impaired only when his brain damage was combined with his drug and alcohol use. Likewise, Dr. Virzi admitted on

---

[11] We note in passing that with crimes like this one, that are "carefully planned, or accompanied by torture, rape or kidnapping," we have often observed "that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence." Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th Cir. 1998) (citations and quotation marks omitted); see also Hall v. Head, 310 F.3d 683, 704-05 (11th Cir. 2002) (finding no prejudice where the psychologists' testimony regarding defendant's behavior was speculative and the evidence in aggravation was strong); Thompson v. Wainwright, 787 F.2d 1447, 1453 (11th Cir. 1986) (finding no prejudice where evidence of defendant's "troubled" childhood and "mild[]" retardation had not been introduced at sentencing, since the sentence "was strongly supported by the aggravating circumstances introduced in the record"); Francis v. Dugger, 908 F.2d 696, 702-04 (11th Cir. 1990) (finding that failure to present additional mitigating evidence of an "impoverished, abused, and socio-economically limited childhood, and . . . of his brain dysfunction, diagnosed by his expert as fetal alcohol syndrome," did not prejudice defendant convicted of torture-murder of government informant).

37

cross-examination that he still agreed with what he found in his original report --

that Kokal suffers from chronic alcoholism and drug abuse -- and there was no

change in his original diagnosis. The experts also confirmed that Kokal was not

insane at the time of the murder, and was not completely out of control.[12]

What's more, other parts of the record undermined the conclusion that Kokal

had brain damage in 1984. Thus, for example, Dr. Virzi -- who knew about

Kokal's substance abuse problems -- concluded in his 1984 report that Kokal was

"oriented to time, person, and place"; his "[i]ntelligence was not impaired"; his

"[r]ecent and remote memory were clear"; he "had a clear idea of what had

happened prior to the above incident and during the above incident"; he

"underst[oo]d[] the consequences of his behavior"; he knew "the difference

between right and wrong"; and he had "no delusions, no homicidal ideas." Virzi

even conceded at the post-conviction hearing that when he examined Kokal in

1984 -- after the 1977 near-drowning and 1983 car accident -- he found no

evidence of organic brain disorder, and Kokal was functioning normally in terms

of his ability to interact and understand.

Nor did any of Kokal's pre-1984 medical records suggest any brain damage.

Following the 1977 swimming pool accident, Kokal underwent a physical

---

[12] Dr. Crown did not prepare a written report on Kokal, apparently because post-conviction counsel had not asked him for one.

examination and x-rays, but nothing unusual -- like aspiration pneumonitis, acidosis, or a skull fracture -- was found.  Similarly, hospital records following the 1983 car accident ruled out a significant head injury, indicated that Kokal's condition was due to alcohol consumption, not head injury, and reported that Kokal was doing well when discharged.  See Kokal, 718 So. 2d at 139 n.2.

The findings of fact made by the state courts are also inconsistent with the theory that Kokal suffered from substantial mental deficiencies.  Notably, Kokal's original trial judge found that "the defendant was at all material times in complete control of his mental and emotional faculties acting deliberately and with pre-meditation," and even though Kokal had testified that "during the evening prior to the death of Russell . . . he had consumed a large quantity of alcohol [,] . . . smoked a number of marijuana cigarettes[, and] . . . was highly intoxicated," "the defendant's statement to his friend, [Mosley], contained no evidence of intoxication [and] . . . was in great detail including his thought process at the time of the killing of Russell."   The judge additionally found that the "testimony of the co-participant, [O'Kelly], does not support intoxication of the defendant by either alcohol or drugs [and showed] deliberate, calculated acts and conduct by the defendant during the course of the robbery and murder of Russell."  The trial court concluded that "the defendant proved to this Court, by his statements and his acts,

39

as well as his demeanor on the witness stand, that he is an individual of above average intelligence, knowledge, and well oriented as to time, space and relationships and well able but unwilling to conform his conduct to the requirements of law and with an ability to appreciate the criminality of his conduct."

Similarly, the Florida Supreme Court observed on direct appeal that Kokal's detailed memory about the crime "contradicts the notion that he did not know what he was doing." Kokal, 492 So. 2d at 1319. Thus, as we have said before, "[a] psychological defense strategy at sentencing is unlikely to succeed where it is inconsistent with the defendant's own behavior and conduct." Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999) (citing Weeks v. Jones, 26 F.3d 1030, 1042 (11th Cir. 1994); Bush v. Singletary, 988 F.2d 1082, 1093 (11th Cir. 1993)).

Moreover, the psychological examination conducted just weeks after Kokal's sentencing by the prison psychologist, Dr. Elaine Pittman, found no evidence of mental illness or mental disorder. As the Florida Supreme Court aptly noted, "prison evaluations [completed soon after Kokal's sentencing] showed that Kokal was not suffering from any mental disorders and did not need counseling." Kokal, 718 So. 2d at 139 n.2. In particular, the report provided that objective

40

testing performed on Kokal had revealed an absence of any neurotic or psychotic symptomalogy, and that Kokal was "characteristically antisocial." We cannot ignore that this evidence would have undermined the new expert testimony. What's more, it may have been "potentially aggravating," because it suggests that Kokal has antisocial personality disorder, "which is a trait most jurors tend to look disfavorably upon" and "is not mitigating but damaging." Suggs, 609 F.3d at 1231 (quotation marks omitted); accord Reed, 593 F.3d at 1248; Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1368 (11th Cir. 2009); Parker, 331 F.3d at 788; Weeks v. Jones, 26 F.3d 1030, 1035 n.4 (11th Cir. 1994).

But even if Kokal had been able to establish that he suffered from brain damage, he would have had to further impress on the jury his substance abuse on the night of the murder. We have repeatedly observed, however, that evidence of drug and alcohol abuse is a two-edged sword:

> The opinion of a medical expert that a defendant was intoxicated with alcohol or drugs at the time of the capital offense is unreliable and of little use as mitigating circumstances evidence when it is predicated solely upon the defendant's own self-serving statements, especially when other evidence is inconsistent with those statements. See Duren v. Hopper, 161 F.3d 655, 662 (11th Cir. 1998). . . . Moreover, even when there is a factual basis for it, a showing of alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing. See Waldrop v. Jones, 77 F.3d 1308, 1313 (11th Cir. 1996).

41

Tompkins, 193 F.3d at 1337-38 (footnote omitted).  See also Waldrop, 77 F.3d at 1313 (evidence concerning Waldrop's history of excessive alcohol and drug use would not constitute evidence in mitigation of the death penalty, since "admission of some of this evidence might have been harmful to Waldrop's case").

And not only would Kokal have had to stress his substance abuse on the night of the murder, but it also may have been revealed that in the 1983 car accident -- that allegedly led to his brain damage -- Kokal had been driving under the influence of alcohol.  It is likewise possible that Kokal's school records, juvenile records, and criminal records may have been introduced in order to demonstrate his behavior before the 1983 car accident.  These records would establish, among other things, that "even at 21 Greg was an accomplished criminal."  Thus, "some of the additional mitigating evidence may have been harmful and tipped the scales still further in favor of the death penalty."  Boyd v. Allen, 592 F.3d 1274, 1301 (11th Cir. 2010); accord Marquard v. Sec'y for Dep't of Corr., 429 F.3d 1278, 1309 (11th Cir. 2005); see also Robinson v. Moore, 300 F.3d 1320, 1350 (11th Cir. 2002) (noting that additional mitigating evidence would have allowed evidence of another crime to be admitted).

Finally, it is worth observing that the jury unanimously recommended the death penalty in this case, and, only after hearing the extensive testimony of each

42

of them, it expressly found that Kokal, and not O'Kelly, was the triggerman. Cf. Harich v. Wainwright, 813 F.2d 1082, 1093 n.8 (11th Cir. 1987) ("Prejudice is more easily shown in jury override cases because of the deference shown to the jury recommendation."), adopted by en banc court, 844 F.2d 1464, 1468-69 (11th Cir. 1988) (en banc), overruling on other grounds recognized in Davis v. Singletary, 119 F.3d 1471, 1482 (11th Cir. 1997).

In short, in the face of a unanimous death-penalty recommendation from the jury, the finding of four statutory aggravators (including that the murder was especially heinous, atrocious and cruel), the finding that Kokal was the triggerman, Kokal's boasting and detailed statement to Mosley, the weaknesses highlighted in Kokal's "new" mitigating evidence, especially in light of Kokal's mental abilities on the night of the murder, and further aggravating evidence that Kokal's "new" mitigating evidence may have revealed, we cannot say that the Florida Supreme Court unreasonably rejected Kokal's claim that his counsel was constitutionally ineffective. Accordingly, we affirm.

**AFFIRMED.**